# Rules and Regulations

Federal Register

Vol. 87, No. 96

Wednesday, May 18, 2022

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Part 1002**

**Equal Credit Opportunity (Regulation B); Revocations or Unfavorable Changes to the Terms of Existing Credit Arrangements**

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Advisory opinion.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB) is issuing this advisory opinion to affirm that the Equal Credit Opportunity Act and Regulation B protect not only those actively seeking credit but also those who sought and have received credit.

**DATES:** This advisory opinion is applicable on May 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Christopher Davis, Attorney-Advisor; Office of Fair Lending and Equal Opportunity, at *CFPB_FairLending@cfpb.gov* or 202–435–7000. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov*.

**SUPPLEMENTARY INFORMATION:** The CFPB is issuing this advisory opinion through the procedures for its Advisory Opinions Policy.[1] Refer to those procedures for more information.

## I. Advisory Opinion

### A. Background

The Bureau is issuing this advisory opinion to affirm that the Equal Credit Opportunity Act (ECOA)[2] and Regulation B[3] protect both those actively seeking credit and those who sought and have received credit. ECOA is a landmark civil rights law that protects individuals and businesses against discrimination in accessing and using credit—"a virtual necessity of life" for most people.[4] Congress enacted ECOA in 1974, initially to address "widespread discrimination . . . in the granting of credit to women."[5] Accordingly, ECOA made it unlawful for "any creditor to discriminate against any applicant on the basis of sex or marital status with respect to any aspect of a credit transaction."[6] From the beginning, this prohibition has protected both those actively seeking credit and those who sought and have received credit.

Then as now, ECOA defined "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit."[7] The drafters of these provisions emphasized that ECOA's prohibition on discrimination "applies to all credit transactions including the approval, denial, renewal, continuation, *or revocation* of any open-end consumer credit account."[8] Among other examples of the sort of discrimination against "applicants" that ECOA would bar, its drafters cited a scenario in which a lender required a "newly married woman whose creditworthiness has otherwise remained the same" to reapply for her existing credit arrangement as a new applicant.[9] The Act also created a private right of action under which aggrieved "applicant[s]" can hold liable a creditor that fails to comply with "any requirement imposed under [ECOA]."[10] And it provided that this private right of action extends to violations of any requirement imposed under ECOA's implementing regulations.[11]

Congress originally tasked the Board of Governors of the Federal Reserve System (Board) with prescribing those regulations.[12] The Board issued those rules, known as Regulation B, the year after ECOA was enacted and several days before the Act took effect.[13] From the beginning, Regulation B made clear that the new law's protections against credit discrimination cover both those currently applying to receive credit and those who have already received it. It did so by defining "applicant" to expressly include not only "any person who applies to a creditor directly for an extension, renewal or continuation of credit" but also, "[w]ith respect to any creditor[,] . . . any person to whom credit is or has been extended by that creditor."[14] In explaining this provision, the Board noted that ECOA's express terms and its legislative history "demonstrate that Congress intended to reach discrimination . . . 'in any aspect of a credit transaction.'"[15]

Two years after enacting ECOA, Congress significantly broadened the Act to prohibit discrimination on bases in addition to sex and marital status.[16] These bases now generally include "race, color, religion, national origin, sex or marital status, or age" as well as the receipt of public-assistance income.[17] In what the Senate drafters called "one of [the amendments'] most important provisions,"[18] the amendments also provided that "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor."[19] The amendments defined

---

[1] 85 FR 77987 (Dec. 3, 2020).

[2] 15 U.S.C. 1691 *et seq.*

[3] 12 CFR part 1002.

[4] S. Rep. 94–589, 94th Cong., 2nd Sess., at 4, *reprinted in* 1976 U.S.C.C.A.N. 403, 406.

[5] S. Rep. 93–278, 93rd Cong., 1st Sess., at 16 (1973).

[6] Public Law 93–495, sec. 503, 88 Stat. 1521, 1521 (1974).

[7] Public Law 93–495, sec. 503, 88 Stat. at 1522 (codified at 15 U.S.C. 1691a(b)).

[8] S. Rep. 93–278, at 27 (emphasis added).

[9] S. Rep. 93–278, at 17.

[10] 15 U.S.C. 1691e(a).

[11] 15 U.S.C. 1691a(g) ("Any reference to any requirement imposed under this subchapter . . . includes reference to the regulations of the Bureau under this subchapter . . . .").

[12] Public Law 93–495, sec. 503, 88 Stat. at 1522.

[13] *See* 40 FR 49298 (Oct. 22, 1975) (promulgating 12 CFR part 202); 40 FR 42030 (Sept. 10, 1975); 40 FR 18183 (Apr. 25, 1975).

[14] 12 CFR 202.3(c) (1976); *see also* 40 FR 49306.

[15] 40 FR 49298 (quoting 15 U.S.C. 1691(a)).

[16] *See* ECOA Amendments of 1976, Public Law 94–239, 90 Stat. 251.

[17] ECOA Amendments of 1976, Public Law 94–239, sec. 2, 90 Stat. 251 (codified at 15 U.S.C. 1691(a)). In 2021, the CFPB issued an interpretive rule to clarify that, with respect to any aspect of a credit transaction, the prohibition against sex discrimination in ECOA and Regulation B encompasses sexual orientation discrimination and gender identity discrimination, including discrimination based on actual or perceived nonconformity with sex-based or gender-based stereotypes and discrimination based on an applicant's associations. 86 FR 14363 (Mar. 16, 2021).

[18] S. Rep. 94–589, 94th Cong., 2nd Sess., at 2, *reprinted in* 1976 U.S.C.C.A.N. 403, 404.

[19] 15 U.S.C. 1691(d)(2); *see also* 15 U.S.C. 1691(d)(3) ("A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken."). In lieu of providing this statement of specific reasons, a creditor may instead disclose the applicant's right

Continued

"adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested."[20] Thus, since 1976, ECOA has provided that "applicants" are entitled to an explanation when the terms of an existing credit arrangement are altered or the credit cancelled outright, among other circumstances.

ECOA's notice requirements "were designed to fulfill the twin goals of consumer protection and education."[21] In terms of consumer protection, "the notice requirement is intended to prevent discrimination *ex ante* because 'if creditors know they must explain their decisions . . . they [will] effectively be discouraged' from discriminatory practices."[22] The notice requirement "fulfills a broader need" as well by educating consumers about the reasons for the creditor's action.[23] As a result of being informed of the specific reasons for the adverse action, consumers can take steps to try to improve their credit status or, in cases "where the creditor may have acted on misinformation or inadequate information[,] . . . to rectify the mistake."[24]

Following the ECOA Amendments of 1976, the Board amended Regulation B, including by adding new provisions to implement ECOA's notice requirement.[25] The amended rule defined "adverse action" to include "[a] termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts."[26] And it required that adverse action notices give a "statement of reasons" for the action that is "specific" and "indicate[s] the principal reason(s) for the adverse action."[27]

Finally, the Board made a "minor editorial change" to Regulation B's definition of "applicant" in order to "express more succinctly the fact that the term includes both a person who requests credit and a debtor," a debtor being one who has already requested and received credit.[28] Whereas Regulation B originally defined "applicant" to include one who "applies to a creditor directly for an extension, renewal or continuation of credit" as well as, "[w]ith respect to any creditor[,] . . . any person to whom credit is or has been extended by that creditor,"[29] the revised definition simply stated that "applicant" includes "any person who requests or *who has received* an extension of credit from a creditor."[30] Although the Board revised other parts of the definition over the years, it never departed from the bedrock understanding of the term "applicant" as including any person "who has received" an extension of credit.[31]

The Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted in 2010, revoked primary rulemaking responsibility under ECOA from the Board and transferred it to the newly created Bureau.[32]

Shortly thereafter, the Bureau republished the Board's ECOA regulations, including the definition of "applicant," without material change.[33] In addition, the Bureau's *Supervision and Examination Manual* makes clear that creditors subject to the Bureau's supervisory jurisdiction must comply with ECOA and Regulation B's requirements with respect to existing accounts. For instance, the Examination Manual explains that "[n]otification of adverse action taken on an *existing* account must also be made within 30 days."[34]

### B. Coverage

This advisory opinion applies to all "creditors" as defined in section 702 of ECOA.[35] As used in this advisory opinion, "existing account holder" refers to an applicant who has applied for and received an extension of credit. "Existing account" or "existing credit arrangement" refers to an extension of credit previously made by a creditor other than an extension of credit that is closed or inactive. This advisory opinion has no application to any other circumstance and does not offer a legal interpretation of any other provisions of law.

### C. Legal Analysis

ECOA and Regulation B plainly protect applicants who have received credit and are existing account holders, not just those in the process of applying for credit. This has been the longstanding position of the Bureau, and the view of Federal agencies prior to the Bureau's creation. Despite this well-established interpretation,[36] the Bureau is aware that some creditors fail to acknowledge that ECOA and Regulation B plainly apply to circumstances that take place after an extension of credit has been granted, including a revocation of credit or an unfavorable change in the terms of a credit arrangement.[37] In addition, the Bureau is aware that some creditors fail to provide applicants with required notifications that include a statement of the specific reasons for the adverse action taken or disclose an applicant's right to such a statement.[38] But ECOA's

---

to receive such a statement. 15 U.S.C. 1691(d)(2)(B); *see also* 12 CFR 1002.9(a)(2)(ii).

[20] 15 U.S.C. 1691(d)(6).

[21] *Fischl* v. *Gen. Motors Acceptance Corp.,* 708 F.2d 143, 146 (5th Cir. 1983); *see also id.* (calling these provisions "[p]erhaps the most significant of the 1976 amendments to the ECOA").

[22] *Treadway* v. *Gateway Chevrolet Oldsmobile Inc.,* 362 F.3d 971, 977–78 (7th Cir. 2004) (quoting *Fischl,* 708 F.2d at 146); *see also* S. Rep. 94–589, at 4 (calling the notice requirement "a strong and necessary adjunct to the antidiscrimination purpose of the legislation").

[23] S. Rep. 94–589, at 4.

[24] *Id.*

[25] 42 FR 1242 (Jan. 6, 1977); 41 FR 49123 (Nov. 8, 1976); 41 FR 29870 (July 20, 1976).

[26] 12 CFR 1002.2(c)(1)(ii).

[27] 12 CFR 1002.9(b)(2).

[28] 41 FR 29870, 29871 (July 20, 1976) (proposed rule).

[29] 12 CFR 202.3(c) (1976).

[30] 12 CFR 202.2(e) (1978) (emphasis added); *see also* 42 FR 1242, 1252 (Jan. 6, 1977) (final rule).

[31] *See* 12 CFR 1002.2(e).

[32] Public Law 111–203, sec. 1085, 124 Stat. 1376, 2083–84.

[33] *See* 76 FR 79442 (Dec. 21, 2011) (promulgating 12 CFR part 1002 & supplement I).

[34] CFPB Supervision and Examination Manual, at ECOA 7, *https://files.consumerfinance.gov/f/documents/201510_cfpb_ecoa-narrative-and-procedures.pdf* (emphasis added); *see also id.* at ECOA 10 ("[a] creditor must preserve any written or recorded information concerning adverse action on an existing account as well as any written statement submitted by the applicant alleging a violation of the ECOA or Regulation B.").

[35] *See* 15 U.S.C. 1691a(e).

[36] *See* 12 CFR 202.3(c) (1976) (expressly defining the term "applicant" to include "any person to whom credit is or has been extended").

[37] *See* Brief of Amici Curiae Consumer Fin. Prot. Bureau, Dep't of Justice, Bd. of Governors of the Fed. Reserve Sys., and Fed. Trade Comm'n in Support of Appellant and Reversal, *Fralish* v. *Bank of Am.,* No. 21–2846 (7th Cir. filed Dec. 16, 2021), *https://files.consumerfinance.gov/f/documents/cfpb_fralish-v-bank-of-america_amicus-brief_2021-12.pdf;* Brief of Amici Curiae Consumer Fin. Prot. Bureau and Fed. Trade Comm'n, *TeWinkle* v. *Capital One, N.A.,* No. 20–2049 (2d Cir. filed Oct. 7, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_amicus-brief_tewinkle-v-capital-one-na_2020-10.pdf.*

[38] Credit cards are one of the most commonly held and widely used financial products in America—over 175 million Americans hold at least one credit card. During the COVID–19 pandemic, credit cards played a vital role as both a source of credit in emergencies and a payment method as more transactions occurred online. According to the CFPB's 2021 Credit Card Report, about 2%, or over 10 million credit card accounts, were closed in 2020 and consumers with low credit scores are two to three times more likely to have their accounts closed than those with a higher credit score. *See* Bureau of Consumer Fin. Prot., *The Consumer Credit Card Market* (Sept. 2021), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2021.pdf.* Additionally, the same report shows that over 10 million accounts experienced a credit line decrease in 2020. *See id.; see also 5 Reasons Credit Card Companies Close Accounts Without Notice—And How to Fix Them,* USA TODAY (July 13, 2021), *https://www.usatoday.com/story/money/personalfinance/budget-and-spending/2021/07/13/5-reasons-a-credit-card-company-can-close-your-account-with-no-notice/*

text, history, purpose, and judicial interpretation all point the same way: As used in ECOA, the term "applicant" includes persons who applied for and have received credit. Any uncertainty about ECOA's protections for existing borrowers is dispelled by Regulation B.

a. Statutory Text

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." [39] Reading together the relevant provisions of ECOA makes clear that the term "applicant" is not limited to those who are in the process of applying for credit. The Supreme Court's analysis in *Robinson* v. *Shell Oil Co.*[40] is instructive. In that case, the Court held that the term "employees" in Section 704(a) of Title VII includes those who were former employees when the discrimination occurred. Writing for a unanimous Court, Justice Thomas explained that although "[a]t first blush, the term 'employees' . . . would seem to refer to those having an existing employment relationship with the employer in question," that "initial impression . . . does not withstand scrutiny in the context of § 704(a)."[41]

For one thing, the Court observed, there is "no temporal qualifier in the statute such as would make plain that § 704(a) protects only persons still employed at the time of the retaliation."[42] The same reasoning applies to the term "applicant" in ECOA, which is not expressly limited to those currently in the process of seeking credit. The Court further noted that "a number of other provisions in Title VII use the term 'employees' to mean something more inclusive or different than 'current employees.'"[43] The same reasoning applies to the term "applicant" used in ECOA.

Reading ECOA's definition of "applicant" alongside the Act's other provisions makes clear that the term includes applicants who have received credit and become existing borrowers. For example, ECOA's core anti-discrimination provision protects "applicant[s]" from discrimination "with respect to *any aspect* of a credit transaction"—not just during the application process itself.[44] The phrase "any aspect of a credit transaction" is most naturally read to include both the initial formation of a credit agreement as well as the performance of that agreement.[45] Consistent with this ordinary meaning, Regulation B has always defined the term "credit transaction" to encompass "every aspect of an applicant's dealings with a creditor," including elements of the transaction that take place after credit has been extended.[46] The expansive language of this provision shows an intent to sweep broadly, beyond just the initial process of requesting credit, to bar discrimination in all parts of a credit arrangement. Indeed, the main Senate report accompanying ECOA specifically noted that "[t]he prohibition applies to all credit transactions including . . . revocation of any open-end consumer credit account."[47]

Similarly, ECOA's disclosure provision requires that creditors give a statement of reasons to "[e]ach applicant" against whom they take "adverse action."[48] ECOA defines "adverse action" to include a "revocation of credit" as well as a "change in the terms of an existing credit arrangement."[49] These are actions that can be taken only with respect to persons who have already received credit.

ECOA's private right of action points in the same direction. It allows an aggrieved "applicant" to bring suit against creditors who fail to comply with ECOA or Regulation B.[50] These references to "applicant[s]" cannot be understood to refer only to those with pending credit applications. Otherwise, a person whose application was denied on a prohibited basis would have no recourse under ECOA's private right of action, which Congress intended would be the Act's "chief enforcement tool."[51] Instead, these references further confirm that the term "applicant" is not limited to those currently applying for credit.[52]

b. Legislative History

Congress's history of amending the statute strongly supports reading the statute to include existing borrowers. As noted, the Board issued Regulation B in 1975, through notice-and-comment rulemaking, shortly before ECOA took effect. The rule defined "applicant" to include "any person to whom credit is or has been extended."[53] If Congress thought this definition an unreasonable departure from the statute it had just passed, it would surely have given some sign of that when it amended and expanded ECOA the following year. Nor is there any doubt that the drafters of those statutory amendments were generally aware of the new Regulation B, as they cited parts of it in explaining their bill.[54]

But the 1976 amendments did not limit the reasonable definition of "applicant" that the Board had promulgated just months before. To the contrary, the 1976 amendments added new provisions—such as the ones entitling "applicants" to a statement of reasons when their credit is revoked or modified—that make sense only if "applicant" is understood to include existing borrowers, as stated in Regulation B. Nor has Congress ever amended the statutory definition of "applicant" or otherwise expressed disapproval of the understanding of that term in Regulation B, despite revising the statute multiple times since 1976.[55]

"[W]hen," as here, "Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one

---

*47470647/;* 'My Credit Card Just Got Canceled and I Don't Know Why,' THE CUT (Sept. 11, 2020), https://www.thecut.com/article/can-my-credit-card-company-cancel-my-card.html.

[39] *Nat'l Ass'n of Home Builders* v. *Defs. of Wildlife,* 551 U.S. 644, 666 (2007) (quotation marks omitted).

[40] 519 U.S. 337 (1997).

[41] *Id.* at 341.

[42] *Id.*

[43] *Id.* at 342.

[44] 15 U.S.C. 1691(a) (emphasis added); *see also Ali* v. *Fed. Bureau of Prisons,* 552 U.S. 214, 218 (2008) ("[T]he word 'any' has an expansive meaning . . . .") (quoting *United States* v. *Gonzales,* 520 U.S. 1, 5 (1997)).

[45] *See, e.g.,* Black's Law Dictionary 1668 (rev. 4th ed. 1968) (defining "transaction" to include the "[a]ct of transacting or conducting any business" and defining "transact" as "equivalent to 'carry on,' when used with reference to business").

[46] 12 CFR 1002.2(m) (defining "credit transaction" to include, among other things, the "revocation, alteration, or termination of credit" and "collection procedures"); 12 CFR 202.3(k) (1976) (defining "credit transaction" to include the "furnishing of credit information and collection procedures"). Accordingly, the Bureau interprets aspects of the credit transactions enumerated in Regulation B as including and encompassing the servicing of that credit, debt collection, loss mitigation, payment plans, settlements, co-signer release, and certain other services provided to existing accountholders.

[47] S. Rep. 93–278, 93rd Cong., 1st Sess., at 27 (1973).

[48] 15 U.S.C. 1691(d)(2).

[49] 15 U.S.C. 1691(d)(6).

[50] 15 U.S.C. 1691e(a); *see also id.* 1691e(b) (a "creditor, other than a government or governmental subdivision or agency," shall be liable to the aggrieved "applicant" for punitive damages); *id.* 1691e(c) (aggrieved "applicant" may seek relief in district court).

[51] S. Rep. 94–589, at 13.

[52] *Cf. Robinson,* 519 U.S. at 343 (similarly concluding that the reference to aggrieved "employees" in Title VII's private right of action shows that that term is not limited to current employees).

[53] 12 CFR 202.3(c) (1976).

[54] *See* S. Rep. 94–589, at 2 (citing the Board's rules and noting that the amendments expanded the Board's rulemaking authority).

[55] *See* FDIC Improvement Act of 1991, Public Law 102–242, sec. 223, 105 Stat. 2306–07; Dodd-Frank Act, Public Law 111–203, secs. 1071, 1474, 124 Stat. 2056–57, 2199–2200.

intended by Congress.' "[56] That maxim applies with particular force here: The first time Congress revisited the statute after the Board defined "applicant" to include existing borrowers, Congress enacted new provisions that implicitly approved the Board's interpretation by requiring that creditors provide an explanation for adverse actions that can be taken only with respect to existing borrowers.

c. Statutory Purpose

Reading "applicant" to protect individuals and businesses from discrimination both during the process of requesting credit and once credit has been extended furthers ECOA's purpose. It prevents a creditor from canceling an existing account because of a borrower's race. It bars a creditor from unfavorably modifying the terms of an existing account—perhaps by lowering the amount available on a line of credit—because of a borrower's national origin. It stops a creditor from requiring women with existing accounts to reapply for their credit upon getting married.[57] And it ensures that a creditor would be required to provide a statement of reasons to the applicant in any of these situations. This is the most plausible interpretation of ECOA.

Finally, reading "applicant" in this way—*i.e.,* ECOA protects applicants from discrimination both during the process of requesting credit and once credit has been extended—precludes obvious paths to evasion. A creditor that wished to deny credit applications on a prohibited basis, or to offer credit on inferior terms for the same prohibited reason, cannot do so by simply extending credit on the terms requested and later revoking or amending the terms of the credit arrangement. Nor can a creditor use similar means to avoid ever having to explain to an applicant the reasons for an adverse action. This interpretation of ECOA, therefore, forecloses a potential loophole that could effectively swallow much of the Act. Such a loophole would be plainly inconsistent with ECOA.

d. Judicial Precedent

Those courts that have properly read the term "applicant" in its statutory context, including the only court of appeals to have addressed the issue, have agreed that the statute protects existing borrowers. In *Kinnell* v. *Convenient Loan Co.,*[58] the Tenth Circuit considered a claim that a creditor discriminated in violation of ECOA when it refused to accept a late payment on an existing loan and instead accelerated the remaining balance due. The court rejected the argument that the plaintiff was not an "applicant" under ECOA because he was no longer actively seeking credit.[59] ECOA, the court explained, prohibits discrimination "with respect to any aspect of a credit transaction,"[60] and was meant "to protect people from the 'denial *or termination* of credit' " on a prohibited basis.[61] The lender's reading of "applicant" would mean that "any sua sponte action on the part of the creditor . . . would not be actionable. Such an interpretation improperly narrows the scope of the ECOA."[62] The court noted that its reading of "applicant" was directly supported by Regulation B.[63]

At least one district court has reached the same conclusion. In *Powell* v. *Pentagon Fed. Credit Union,*[64] the court held that the plaintiff, who alleged that his existing credit plan was terminated on a prohibited basis, was an "applicant" under ECOA. The court relied on ECOA's requirement that "applicants" receive notice when their credit is revoked and on the longstanding definition in Regulation B.[65] The court observed that the contrary interpretation would be wholly at odds with ECOA's purposes because it "would preclude a plaintiff with an existing account from bringing a claim for the discriminatory revocation of that account."[66] The court found nothing to "suggest[ ] that Congress' intent to discourage discrimination against applicants somehow ceases when the alleged discrimination is against existing credit customers."[67]

The Bureau acknowledges that a few other district court decisions have interpreted "applicant" to include only persons actively seeking credit, but the Bureau does not believe this interpretation is persuasive.[68] No court of appeals has endorsed these district courts' narrow reading. These district court decisions read "applicant" in isolation instead of reading this statutory term in context, as required by the Supreme Court. For example, these decisions did not attempt to square their interpretation with ECOA's requirement that "applicants" receive an explanation when their existing credit is terminated or modified. Nor did they grapple with the clear loophole their interpretation would create or the degree to which it would frustrate the Act's remedial purposes.

e. Regulation B

Regulation B has always defined the term "applicant" to include those who applied for and have received credit.[69] Other provisions reflect the same interpretation.[70] Neither the Board nor the Bureau has ever amended the rule to reflect a contrary understanding of the term.

As described above, the best interpretation of ECOA is that the term "applicant" includes existing borrowers. It was thus reasonable for the Board and then the Bureau to adopt that interpretation in Regulation B. Adopting the contrary reading would have led to the serious textual inconsistencies described above and run directly contrary to the statute's purposes. Regulation B's definition avoids those difficulties and, in the process, serves to "carry out" and "effectuate" the purposes of ECOA.[71] And because the contrary interpretation would open a glaring loophole in ECOA, Regulation B's definition is "necessary or proper . . . to prevent circumvention or evasion" of the Act.[72]

Notably, Regulation B has expressly included existing borrowers as applicants since the rule was first promulgated through notice-and-comment rulemaking in 1975. Indeed, the interpretation of "applicant" discussed here has been confirmed by numerous Federal agencies for decades. For example, nine separate agencies or offices, including the Department of Justice, Federal Trade Commission, and

---

[56] *CFTC* v. *Schor,* 478 U.S. 833, 846 (1986) (quoting *NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 274–75 (1974)).

[57] *Cf.* S. Rep. 93–278, at 17 (citing this very scenario as an example of the discrimination against "applicants" that ECOA prohibits).

[58] 77 F.3d 492 (10th Cir. 1996) (unpublished table decision).

[59] *Id.* at *2.

[60] *Id.* (quoting 15 U.S.C. 1691(a)).

[61] *Id.* (emphasis added) (quoting *Miller* v. *American Express Co.,* 688 F.2d 1235, 1239 (9th Cir. 1982)).

[62] *Id.*

[63] *Id.*

[64] No. 10–cv–785, 2010 WL 3732195 (N.D. Ill. Sept. 17, 2010).

[65] *Id.* at *4–5.

[66] *Id.* at *4.

[67] *Id.* at *4 n.2.

[68] *See, e.g., TeWinkle* v. *Capital One, N.A.,* No. 1:19–cv–01002, 2019 WL 8918731, at *4–5 (W.D.N.Y. Dec. 11, 2019); *Kalisz* v. *Bank of America, N.A.,* No. 1:18–cv–00516, 2018 WL 4356768, at *2–3 (E.D. Va. Sept. 11, 2018).

[69] *See* 12 CFR 1002.2(e) (including in the definition "any person . . . who has received an extension of credit from a creditor"); *see also* 12 CFR 202.3(c) (1976) (including in the definition "any person to whom credit is or has been extended by [a] creditor").

[70] *See, e.g.,* 12 CFR 1002.2(m) (defining "credit transaction" to mean "every aspect of *an applicant's* dealings with a creditor regarding an application for credit *or an existing extension of credit*") (emphasis added).

[71] 15 U.S.C. 1691b(a).

[72] *Id.*

the Board, previously published a statement confirming their view that ECOA prohibits discrimination in the treatment of existing borrowers, such as by "[t]reat[ing] a borrower differently in servicing a loan or invoking default remedies" or "[using] different standards for pooling or packaging a loan in the secondary market."[73] The same view is reflected in the manual used by the Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, and other financial regulators to conduct examinations of financial institutions for compliance with fair lending laws.[74] The Bureau has consistently taken the same view of "applicant," including by reissuing the Board's original definition; issuing guidance that Regulation B "covers creditor activities before, during, and after the extension of credit";[75] and taking enforcement action to address violations of ECOA against existing borrowers.[76] In short, the Bureau's interpretation is longstanding and well established.

## II. Regulatory Matters

This advisory opinion is an interpretive rule issued under the Bureau's authority to interpret ECOA and Regulation B, including under section 1022(b)(1) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which authorized guidance as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of Federal consumer financial laws.[77]

By operation of ECOA section 706(e), no provision of ECOA imposing any liability applies to any act done or omitted in good faith in conformity with this interpretive rule, notwithstanding that after such act or omission has occurred, the interpretive rule is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.[78]

---

[73] Policy Statement on Discrimination in Lending, 59 FR 18266, 18268 (Apr. 15, 1994).

[74] *See* Interagency Fair Lending Examination Procedures, at ii (Aug. 2009), *available at* https://go.usa.gov/xeY37.

[75] Bureau of Consumer Fin. Prot., Equal Credit Opportunity Act Examination Procedures, at 1 (Oct. 2015), *available at* https://go.usa.gov/xekcN.

[76] *See, e.g., In re American Express Centurion Bank and American Express Bank, FSB,* No. 2017–CFPB–0016, 2017 WL 7520638 (Aug. 23, 2017) (consent order resolving claims that creditors discriminated against existing borrowers on the basis of race and national origin by, for example, subjecting certain borrowers to more aggressive collection practices).

[77] 12 U.S.C. 5512(b)(1). The relevant provisions of ECOA and Regulation B form part of Federal consumer financial law. 12 U.S.C. 5481(12)(D), (14).

[78] 15 U.S.C. 1691e(e).

---

As an interpretive rule, this rule is exempt from the notice-and-comment rulemaking requirements of the Administrative Procedure Act.[79] Because no notice of proposed rulemaking is required, the Regulatory Flexibility Act does not require an initial or final regulatory flexibility analysis.[80] The Bureau also has determined that this interpretive rule does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring approval by the Office of Management and Budget under the Paperwork Reduction Act.[81]

Pursuant to the Congressional Review Act,[82] the Bureau will submit a report containing this interpretive rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to the rule's published effective date. The Office of Information and Regulatory Affairs has designated this interpretive rule as not a "major rule" as defined by 5 U.S.C. 804(2).

**Rohit Chopra,**
*Director, Consumer Financial Protection Bureau.*

[FR Doc. 2022–10453 Filed 5–17–22; 8:45 am]
**BILLING CODE 4810–AM–P**

---

## POSTAL SERVICE

### 39 CFR Part 111

### Domestic Competitive Products Pricing and Mailing Standards Changes

**AGENCY:** Postal Service™.
**ACTION:** Final rule.

**SUMMARY:** The Postal Service is amending *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM®), to reflect changes to pricing and mailing standards for certain competitive products.

**DATES:** *Effective:* July 10, 2022.

**FOR FURTHER INFORMATION CONTACT:** Steven Jarboe at (202) 268–7690, Margaret Pepe (202) 268–3078, or Garry Rodriguez at (202) 268–7281.

**SUPPLEMENTARY INFORMATION:** This final rule describes new price and product features for competitive products, by class of mail, established by the

---

[79] 5 U.S.C. 553(b).

[80] 5 U.S.C. 603(a), 604(a).

[81] 44 U.S.C. 3501–3521.

[82] 5 U.S.C. 801 *et seq.*

---

Governors of the United States Postal Service®. New prices are available under Docket Number CP2022–62 on the Postal Regulatory Commission (PRC) website at *https://www.prc.gov,* and on the Postal Explorer® website at *https://pe.usps.com.*

The Postal Service will revise *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM), to reflect changes to certain pricing and mailing standards for the following competitive products:
• Priority Mail®.
• Parcel Select®.
• Return Services.
• Other.

Competitive price and product changes are identified by product as follows:

### Priority Mail

*Priority Mail Commercial Plus Cubic*

Currently, Commercial Plus cubic prices are available to Priority Mail customers whose account volumes exceeded 50,000 pieces in the previous calendar year and have a customer commitment agreement with the Postal Service.

The Postal Service is revising the DMM to remove the volume requirements for Priority Mail Commercial Plus Cubic prices. The Postal Service will also eliminate the requirement to have a customer commitment agreement for cubic pricing. Priority Mail cubic prices will now be available to all commercial customers.

*Priority Mail Maximum Insurance Indemnity*

The Postal Service is proposing to make the maximum insurance indemnity included with retail and commercial priced Priority Mail limited to a maximum liability of $100.00. See **Federal Register** document, *New Mailing Standards for Domestic Mailing Services Products* (87 FR 21601–21603), for additional information.

### Parcel Select

*Parcel Select Ground Cubic*

The Postal Service is implementing cubic pricing under the Parcel Select Ground price category. Parcel Select Ground cubic pricing will be available to eligible Parcel Select Ground customers for rectangular, nonrectangular, and soft pack mailpieces. Each mailpiece must measure 1 cubic foot or less, weigh 20 pounds or less, and the longest dimension may not exceed 18 inches. Cubic-priced mailpieces may not be rolls or tubes. Parcel Select Ground