# Court Exhibit D: Notice of Legal Claims (Civil and Criminal)

TAMAH JADA CLARK



TO:

American Express Company
c/o CT Corporation System
1108 E South Union Ave
Midvale, UT, 84047

*Sent via USPS Certified Mail®*

-AND-

Stephen J. Squeri
Chairman And Chief Executive Officer
200 Vesey Street
New York, NY 10285

*Sent via FedEx® 2-Day Shipping*

Laureen E. Seeger, Chief Legal Officer
American Express Executive Committee
200 Vesey Street
New York, NY 10285

*Sent via FedEx® 2-Day Shipping*

Friday, February 28, 2025

**RE: Notice of Legal Claims (Civil and Criminal)**
**& Demand for Relief for Platinum Card Ending in -08007**
(In Accordance with Platinum Card® Cardmember Agreement, and the National Bank Act (12
USC § 1 *et seq.*), and the Financial Institutions Act (UT Code § 7-1-102 *et seq.*))

Dear Mr. Squeri and Ms. Seeger,

I am writing to you concerning multiple legal claims that I have arising under the
Platinum Card® Cardmember Agreement, hereinafter "Agreement", for Platinum Card ending in
-08007. (*See* **Attachment # 1**: *Agreement*). I would like to make you aware that I have made
several good faith attempts to resolve this matter with Jennifer Fell and Mia Figueroa who are
employed with your Global Litigation & Investigations Team, General Counsel's Organization.
(*See* **Attachment #2**: *Amex GCO E-mail Chain*).

1

I requested that American Express and I cooperate to achieve a peaceful, expeditious, confidential resolution. However, Ms. Fell and Ms. Figueroa decided that expensive, time-consuming, reputationally damaging litigation is their preference for American Express. As a responsible, corporate business professional, I am aware that at times haughty, foolish, immature subordinates make unwise, non-binding decisions which could unfairly incur great liability for a company. Accordingly, I am making a final attempt at an amicable resolution with the decision-makers of American Express.

On Wednesday, February 26, 2025, I received e-mail notification that my account was canceled—without prior communication or warning of any kind. (*See* **Attachment #3**: *Account Cancellation*). This was spitefully done at the behest of Ms. Fell and Ms. Figueroa who have failed and/or refused to communicate with me since February 20, 2025. Nevertheless, I maintain the right to pursue all of my claims per a provision of the Claims Resolution section (Agreement, p. 7) which provides: "[t]his section will survive termination of your Account". Per the Governing Law provision (Agreement, p. 6), "Utah law and federal law govern this Agreement and [my] Account". Several state and federal laws—civil and criminal—have been violated, as will be demonstrated hereafter.

This situation arises from a Claim Notice dated August 22, 2024, and sent to American Express ADR, for a claim of $5,597.73. (*See* **Attachment #4**: *Claim Notice*). I did not receive a response until October 29, 2024, at 10:16 AM, from David DeSales Switzler, via email communication— more than 60 days later. The Agreement states we are to attempt informal resolution before resorting to other options but only allows 30 days for the claim to be sent to JAMS or the AAA for mediation. The *strategically* delayed response on the part of American Express deprived me of the right to mediation which practice is unethical, deceptive, and illegal; and it constitutes *theft by deception*, under UT Code § 76-6-405, [1] and is a second degree felony because the value of the property exceeds $5,000. *See* UT Code § 76-6-404(3)(a)(i). Rights are "personal property" under the laws of Utah (*see* UT Code § 68-3-12.5(24)).

The 30-day limitation on the right to mediation in this instance is invalid and unenforceable, yet the Arbitration section as well as the litigation provision remain valid and enforceable.[2] I would like to avail of my right to mediation whereby American Express bears all fees of the mediator, and all applicable statutes of limitation are tolled from August 22, 2024, until said mediation ends: *"[a]ll applicable statutes of limitation will be tolled from the date you or we send the claim notice until termination of the mediation."* (Agreement, p. 7). Note: The conspiratorial deprivation of my rights is an inchoate offense under UT Code § 76-6-201, [3] and is a third degree felony pursuant UT Code § 76-4-202(3).

---

[1] "An actor commits theft by deception if the actor obtains or exercises control over property of another person: (i) by deception; and (ii) with a purpose to deprive the other person of property." UT Code § 76-6-405.

[2] . "If any portion of this Claims Resolution section, except as otherwise provided in the Limitations on Arbitration subsection, is deemed invalid or unenforceable, it will not invalidate the remaining portions of this Claims Resolution section." (Agreement, p. 7).

[3] "For purposes of this part a person is guilty of conspiracy when he, intending that conduct constituting a crime be performed, agrees with one or more persons to engage in or cause the performance of the conduct and any one of them commits an overt act in pursuance of the conspiracy, except where the

If you review my account, you will see that I have had a perfect payment history and track record with American Express. I was given a Pay Over Time limit of $45,000 and a Plan It limit of $40,000—nearly $100,000—and no spend limit, due to my excellent history and hard work building trust with American Express. But my account was abruptly closed 02/26/2025 because Ms. Fell and Ms. Figuero decided to abuse their power to "teach me a lesson".

According to page 1 of the Agreement, the issuer of the Platinum Card® is American Express National Bank, hereinafter "Bank", which the Utah Department of Financial Institutions (UDFI) says is located at 4315 S 2700 W, Salt Lake City, Utah 8418 under the leadership of Anré Williams, CEO. The Office of the Comptroller of the Currency (OCC) regulates the Bank and requires its National Director, Mr. Williams,[4] to swear an oath to diligently and honestly administer the affairs of the bank, [5] and to not knowingly violate, or willingly permit to be violated any applicable statute or regulation pursuant 12 U.S.C. § 73 [6] and CFR 12 § 7.2008(b). [7] (*See* **Attachment #5**: *Bank Director Oath*).

The Comptroller's Handbook titled "Credit Card Lending" (Version 2.0, April 2021) prepared for OCC examiners (e.g. the Council [8]) addresses Account Closures on page 35 thereof which says:

---

offense is a capital felony, a felony against the person, arson, burglary, or robbery, the overt act is not required for the commission of conspiracy." UT Code § 76-6-201.

[4] " Pursuant to 12 U.S.C. 76, the person serving as, or in the function of, president of a national bank, regardless of title, must be a member of the board of directors. A director other than the person serving as, or in the function of, president may be elected chairman of the board." CFR 12 § 7.2012.

[5] "The business and affairs of a national bank must be managed by or under the direction of the board of directors. The board of directors should refer to OCC published guidance for additional information regarding responsibilities of directors." CFR 12 § 7.2010.

[6] " Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate or willingly permit to be violated any of the provisions of title 62 of the Revised Statutes". 12 U.S.C. § 73.

[7] "Each national bank director must execute either a joint or individual oath at the first meeting of the board of directors that the director attends after the director is appointed or elected. A national bank director must take another oath upon re-election, notwithstanding uninterrupted service. Appropriate sample oaths may be found in the Charter Booklet of the Comptroller's Licensing Manual available at *www.occ.gov.*" CFR 12 § 7.2008(b).

[8] "The Council was established by the Federal Financial Institutions Examination Council Act of 1978 (Act), 12 U.S.C. 3301-3308. It is composed of the Comptroller of the Currency; the Chairman of the Federal Deposit Insurance Corporation; a Governor of the Board of Governors of the Federal Reserve System; the Chairman of the Federal Home Loan Bank Board; and the Chairman of the National Credit Union Administration Board." 12 CFR § 1101.2(a).

[8] "The Bureau may take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a).

"Examples of appropriate line closures include accounts of deceased customers, accounts of bankrupt customers, accounts that have been inactive for a specified time, and accounts that show significant financial deterioration over a relatively short time."

My account does not fall within the OCC's "sound policies and procedures" guidelines for when it is appropriate to close an account. Ms. Fell and Ms. Figueroa maliciously closed my account in retaliation against me for requesting that American Express comply with federal law (i.e. Fair Credit Billing Act/FCBA and Truth in Lending Act/TILA) via my Claim Notice (*see* **Attachment # 4**).

Closing my account was an unfair, deceptive, or abusive practice (UDAAP) as defined by the Consumer Financial Protection Bureau (CFPB). (*See* **Attachment # 6**: *CFPB Consumer Laws and Regulations (UDAAP)*). UDAAPs are identified as "prohibited acts" under 12 U.S.C. § 5536(a)(1)(B): *"[i]t shall be unlawful…to engage in any unfair, deceptive, or abusive act or practice"*. Furthermore, it is illegal for American Express to offer services and products not in conformity with FCBA, TILA or other federal law—and also illegal to punish me for insisting upon compliance with the law— under 12 U.S.C. § 5536(a)(1)(A): *"[i]t shall be unlawful…to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law"*.

Closing my account was a violation as defined at 12 U.S.C. § 5565(1)(5) as *"any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law."* If I notify them, the CFPB will be empowered to intervene in this matter, under 12 U.S.C. § 5531(a), [9] and demand, without limitation, restitution, civil money penalties, and to provide public notification regarding the violation, pursuant to 12 U.S.C. § 5565(a)(2). Public notice would likely bring about class-action lawsuits for similar occurrences suffered by other cardholders and customers. In addition to Ms. Fell's and Ms. Figueroa's insurmountable irresponsibility and unprofessionalism causing me loss of wages and emotional duress, these two culprits have unnecessarily exposed Bank shareholders to extreme risk of loss resulting from potential reputational damage to the Bank.

According to the Federal Financial Institutions Examination Council (FFIEC), the Bank is subject to the jurisdiction of the executive branch of the federal Government of the United States because its primary regulator is the OCC. This means that every attempt by Ms. Fell and Ms. Figueroa to deny or cover up their conspiracy against me is punishable by federal fines and imprisonment for up to 5 years under 18 U.S.C. § 1001(a)(2) & (3):

"whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully makes any materially false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or

---

[9] "The Bureau may take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a).

document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years".

It would be a violation of Mr. William's oath and fiduciary obligations—if I notify him of this matter— to allow Ms. Fell and Ms. Figueroa to go unpunished for their illicit activity and inexcusable behavior, and a disservice to both Bank shareholders and to the public if these two individuals are not immediately terminated. Additionally, the CFPB—if involved in this matter— is required, under 12 U.S.C. § 5566, to report this matter to the U.S. Attorney General for criminal prosecution:

> "If the Bureau obtains evidence that any person, domestic or foreign, has engaged in conduct that may constitute a violation of Federal criminal law, the Bureau shall transmit such evidence to the Attorney General of the United States, who may institute criminal proceedings under appropriate law. Nothing in this section affects any other authority of the Bureau to disclose information."

Any written report or statement made about me that attempts to justify closing my account in violation of federal law is a *false report* that exposes the Bank and its director, officers, and agents to state-level criminal prosecution under UT Code § 76-10-707:

> "Every director, officer, or agent of any corporation or joint stock association who knowingly makes or concurs in making or publishing any written report, exhibit, or statement of its affairs or pecuniary condition, containing any material statement which is false is guilty of a class B misdemeanor."

Entering false statements about what has transpired with my account electronically within your internal system comes within the definition of a "written" statement, because "writing" includes *"information stored in an electronic or other medium if the information is retrievable in a perceivable format"* (*see* UT Code § 68-3-12.5(25)). Pursuant to the Financial Institutions Act (UT Code § 7-1-102 *et seq.*), the Commissioner—if I notify him—has a right and a duty to examine the Bank's books and records, [10] including electronic statements and reports, to protect my interests as a customer of the Bank (*see* UT Code § 7-1-102(1)(b)). [11]The Commissioner would also be required to cooperate with federal regulators and regulators from other states to investigate and potentially prosecute for crime (*see* UT Code § 7-1-102(1)(f)).[12]

---

[10] "If the commissioner finds that it is in the public interest and necessary to protect the depositors and other customers of a financial institution, he may: (1) examine the books and records of any financial institution holding company and require the company to furnish whatever reports that he considers appropriate to properly supervise the company's financial institution subsidiaries". UT Code § 7-1-510(1).
[11] "The Legislature finds it is in the interest of the citizens of this state, and is the purpose of this title, to (b) protect the interests of shareholders, members, depositors, and other customers of financial institutions operating in this state". UT Code § 7-1-102(1)(b).
[12] "The Legislature finds it is in the interest of the citizens of this state, and is the purpose of this title, to: cooperate with federal regulators and regulators from other states in regulating financial institutions, in

Moreover, in the event of a state-level criminal investigation, providing false or misleading information (*see* UT Code § 76-8-504.6) would be illegal, and altering, concealing, or removing records to conceal a crime would be obstruction of justice (UT Code § 76-8-306(2)). Also, a pattern of the heretofore discussed illicit activities would fall under the Pattern of Unlawful Activity Act (UT Code § 76-10-1603 *et seq.*). Furthermore, criminal prosecution would not preclude me from seeking civil remedies for my private legal claims: *"[w]hen the violation of a right admits of both a civil and criminal remedy, the right to prosecute the one is not merged in the other."* UT Code § 68-3-4. My legal claims include, but are not limited to: breaches of contract, breaches of public duty, interference with contractual relations, fraud, and interference with enjoyment of property, as well as injury to peace, happiness, and feelings—all of which are cognizable at common law. The state of Utah has adopted the common law (*see* UT Code § 68-3-1 [13]), which prevails over statute law (*see* UT Code § 68-3-2(1)) [14].

If we are unable to engage in confidential mediation for which American Express will pay all fees, or arrive at a peaceable, resolution by other private informal means, then I reserve the right to prosecute my claims in person, [15] at common law in the Utah courts of general jurisdiction, pursuant Article VIII, Section 5, Constitution of the State of Utah [16]; or, I can prosecute my claims in diversity, under 28 U.S.C. § 1332, [17] in the United States District Court for the District of Washington, because I am not a citizen of the state of Utah and the amount in controversy would far exceed the sum of $75,000. If it becomes necessary litigate, then please be aware that I would seek nominal, actual, special, and exemplary (i.e. *punitive*) damages due to gross, willful negligence and malice, which escalates my claims to *aggravated* torts. When "a

---

improving the quality of regulation, and in promoting the interests of this state in interstate matters". UT Code § 7-1-102(1)(f).

[13] "The common law of England so far as it is not repugnant to, or in conflict with, the constitution or laws of the United States, or the constitution or laws of this state, and so far only as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people hereof, is hereby adopted, and shall be the rule of decision in all courts of this state." UT Code § 68-3-1.

[14] "The rule of the common law that a statute in derogation of the common law is to be strictly construed does not apply to the Utah Code." UT Code § 68-3-2(1).

[15] " All courts shall be open, and every person, for an injury done to the person in his or her person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, with or without counsel, any civil cause to which the person is a party." Article I, Section 11, Constitution of the State of Utah.

[16] "The district court shall have original jurisdiction in all matters except as limited by this constitution or by statute, and power to issue all extraordinary writs. The district court shall have appellate jurisdiction as provided by statute. The jurisdiction of all other courts, both original and appellate, shall be provided by statute. Except for matters filed originally with the Supreme Court, there shall be in all cases an appeal of right from the court of original jurisdiction to a court with appellate jurisdiction over the cause." Article VIII, Section 5, Constitution of the State of Utah.

[17] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between- (1) citizens of different States". 28 U.S.C. § 1332.

breach of a public duty as an intentional tort or such entire want of care, which would raise the presumption of conscious indifference to consequences, then [exemplary/punitive] damages may be recovered as tort". *Taylor v. Powertel, Inc.*, 250 Ga. App. 356 (Ga. Ct. App. 2001)

It is customary under the common law and statute law to punish for aggravated misconduct via excess compensation in the form of damages. *Missouri Pacific Railway Co. v. Humes*, 115 U.S. 512, 521 (1885) ("It is the duty of every State to provide, in the administration of justice, for the redress of private wrongs; yet the damages which should be awarded to the injured party are not always readily ascertainable… The general rule undoubtedly is that they should be precisely commensurate with the injury. Yet in England and in this country, they have been allowed in excess of compensation, whenever malice, gross neglect, or oppression has caused or accompanied the commission of the injury complained of".)

The aim of awarding damages is to help prevent similar behavior. *Herbert v. Lando*, 441 U.S. 153, 172 (1979). Any punitive award received would entail "much larger damages" than would be exacted "against a person of ordinary circumstances" commensurate with the value of the Bank. *Washington Gas Light Co. v. Lansden*, 172 U.S. 534 (1899).

I am hopeful (and requesting) that American Express may consider engaging in mediation with me at this time rather than resort to superfluous means of resolving this matter. I am ready and prepared to take immediate and decisive action in whichever direction American Express may decide. Thank you for your time.

Respectfully,


*/s/ Tamah Jada Clark*
TAMAH JADA CLARK

P.S.,

Please, if it is not too much to ask, send me any available information, brochures, or pamphlets you have available regarding your Centurion Card®. Thank you in advance.

ENCLOSURES

 (Attachments #1-#6)


CC:

| | | |
|---|---|---|
| American Express ADR | Jennifer Fell | Mia Figueroa |
| c/o CT Corporation System | Jennifer.Fell@aexp.com | Mia.Figueroa@aep.com |
| 28 Liberty Street New York | Global Litigation & | Global Litigation & |
| New York 10005 | Investigations Team | Investigations Team |
| | General Counsel's Organization | General Counsel's Organization |

**Cardmember Agreement: Part 1 of 2**

**As of:** 07/01/2024

**Platinum Card® from American Express**
**Issuer:** American Express National Bank

## Attachment #1: Agreemnt

## Rates and Fees Table

| Interest Rates | |
|---|---|
| **Annual Percentage Rate (APR) for Pay Over Time Feature** | Prime Rate + **12.74%** to Prime Rate + **20.74%**<br>This is a variable APR. See *Explanation of Variable Rates* below. |
| **APR for Cash Advances** | Prime Rate + 21.99%<br>This is a variable APR. See *Explanation of Variable Rates* below. |
| **Penalty APR and When it Applies** | Prime Rate + 26.74%<br>This is a variable APR. See *Explanation of Variable Rates* below.<br>This APR will apply to your Account if you:<br>1) make one or more late payments; or<br>2) make a payment that is returned by your bank.<br>We may also consider your creditworthiness in determining whether or not to apply the penalty APR to the Pay Over Time balance(s) on your Account.<br>**How Long Will the Penalty APR Apply?** If the penalty APR is applied, it will apply for at least 6 months. We will review your Account every 6 months after the penalty APR is applied. The penalty APR will continue to apply until you have made timely payments with no returned payments during the 6 months being reviewed. |
| **Paying Interest** | Your due date is at least 25 days after the close of each billing period. We will not charge you interest on charges automatically added to a Pay Over Time balance if each month you pay your Account Total New Balance on your billing statement (or, if you have a Plan balance, your Adjusted Balance on your billing statement) by the due date. If you have Cash Advance on your Account, we will begin charging interest on cash advances on the transaction date.<br>If you are enrolled in Pay Over Time Select: we will begin charging interest on purchases added to a Pay Over Time Select balance at your request on the date that they are added to your Pay Over Time Select balance. |
| **Plan Fee (Fixed Finance Charge)** | A monthly fee up to **1.33%** of each purchase placed in a plan based on: either the APR that would otherwise apply to that purchase (for purchases in a Pay Over Time balance), the APR that applies to the Pay Over Time feature at the time you create the plan (for purchases in a Pay In Full balance), or the lower of the two APRs (for purchases that are divided between a Pay Over Time balance and a Pay In Full balance); the plan duration; and other factors. (please refer to the Plan It section for additional details). |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore.** |
| Fees | |
| **Annual Membership Fee** | $695 |
| **Transaction Fees**<br>• Cash Advance<br>• Foreign Transaction | Either **$10** or **5%** of the amount of each cash advance, whichever is greater.<br>**None.** |
| **Penalty Fees**<br>• Late Payment<br>• Returned Payment | Up to **$40**<br>Up to **$40** |

**How we calculate interest:** We use the Average Daily Balance method (including new transactions). See the *How we calculate interest* section in Part 2.

**Explanation of Variable Rates:** If the Prime Rate increases, variable APRs (and corresponding DPRs) will increase. In that case, you may pay more interest and may have a higher Minimum Payment Due. When the Prime Rate changes, the resulting changes to variable APRs take effect as of the first day of the billing period. The Daily Periodic Rate (DPR) is 1/365th of the APR, rounded to the nearest one ten-thousandth of a percentage point. Variable APRs will not exceed 29.99%.

## How Rates and Fees Work

| Rates for Pay Over Time and/or Cash Advance balance(s) | | |
|---|---|---|
| **Penalty APR for new transactions** | The penalty APR may apply to new transactions if:<br>• you do not pay at least the Minimum Payment Due by the Payment Due Date on one or more occasions; or<br>• your payment is returned by your bank.<br><br>We may also consider your creditworthiness in determining whether or not to apply the penalty APR to the Pay Over Time balance(s) on your Account. | If the penalty APR applies to a balance, it will apply to charges added to that balance 15 or more days after we send you notice.<br><br>We will review your Account every 6 months after the penalty APR is applied. The penalty APR will continue to apply until you have made timely payments with no returned payments during the 6 months being reviewed. |
| **Fees** | | |
| **Annual Membership** | This fee is on the *Rates and Fees Table* on page 1 of Part 1. Each Additional Platinum Card is $195 annually, and each Companion Platinum Card is $0 annually. | |
| **Plan Fee** | A monthly plan fee of up to 1.33% of each purchase placed in a plan based on: either the APR that would otherwise apply to that purchase (for purchases in a Pay Over Time balance), the APR that applies to the Pay Over Time feature at the time you create the plan (for purchases in a Pay In Full balance), or the lower of the two APRs (for purchases that are divided between a Pay Over Time balance and a Pay In Full balance); the plan duration; and other factors. For more information, see *About Plan It* in Part 2. | |
| **Late Payment** | Up to $40. If we do not receive the Amount Due (or Minimum Payment Due, if applicable) by the Payment Due Date, the fee is $29. If this happens again within the next 6 billing periods, the fee is $40. However, the late fee will not exceed the Amount Due (or Minimum Payment Due, if applicable). Paying late may also result in a penalty APR for new transactions in a Pay Over Time balance. See *Penalty APR for new transactions* above. | |
| **Returned Payment** | Up to $40. If you make a payment that is returned unpaid the first time we present it to your bank, the fee is $29. If you do this again within the same billing period or the next 6 billing periods, the fee is $40. However, the returned payment fee will not exceed the Amount Due (or Minimum Payment Due, if applicable). A returned payment may also result in a penalty APR for new transactions in a Pay Over Time balance. See *Penalty APR for new transactions* above. | |
| **Returned Check** | $38 if you use your card to cash a check at one of our approved locations and the check is returned unpaid. We will also charge you the unpaid amount. | |
| **Account Re-opening** | $25 if your Account is cancelled, you ask us to re-open it, and we do so. | |
| **Cash Advance** | 5% of an ATM cash advance (including any fee charged by the ATM operator) or other cash advance, with a minimum of $10. We will add this fee to the Cash Advance balance. | |
| **Foreign Transaction** | None | |

**Part 1, Part 2 and any supplements or amendments make up your Cardmember Agreement.**

FDR 1176477      **Cardmember Agreement: Part 2 of 2**      Doc 27303

## How Your American Express Account Works

### Introduction

| About your Cardmember Agreement | This document together with Part 1 make up the Cardmember Agreement *(Agreement)* for the *Account* identified on page 1 of Part 1. Any supplements or | amendments are also part of the Agreement. When you use the Account (or you sign or keep the card), you agree to the terms of the Agreement. |
|---|---|---|
| **Changing the Agreement** | We may change this Agreement, subject to applicable law. We may do this in response to the business, legal or competitive environment. This written Agreement is a final expression of the agreement governing the Account. The written Agreement may not be contradicted by any alleged oral agreement. | We cannot increase the interest rate on existing balances except in limited circumstances. Changes to some terms may require 45 days advance notice, and we will tell you in the notice if you have the right to reject a change. We cannot change certain terms during the first year of your Cardmembership. |
| **Words we use in the Agreement** | *We, us,* and *our* mean the issuer shown on page 1 of Part 1. *You* and *your* mean the person who applied for this Account and for whom we opened the Account. You and your also mean anyone who agrees to pay for this Account. You are the *Basic Cardmember*. You may request a card for an *Additional Cardmember* (see *About Additional Cardmembers* in Part 2).<br><br>*Card* means any card or other device that we issue to access your Account. A *charge* is any amount added to your Account, such as purchases, cash advances, fees and interest charges. A *purchase* is a charge for goods, services, or person-to-person transactions. | A *cash advance* is a charge to get cash or cash equivalents, including travelers cheques, gift cheques, foreign currency, money orders, digital currency, casino gaming chips, race track wagers, and similar offline and online betting transactions. A *person-to-person transaction* is a charge for funds sent to another person or a charge to add funds to your Amex Send™ Account. A *plan* is a portion of your account balance that you have selected to pay through a set number of monthly payments using Plan It.<br><br>To *pay* by a certain date means to send your payment so that we receive it and credit it to your Account by that date (see *About your payments* in Part 2). |

### About using your card

| Using the card | You may use the card to make charges. We decide whether to approve a charge based on how you spend and pay on this Account and other Accounts you have with us. We also consider your credit history and score and your personal resources that we know about.<br><br>However, if there is a Spending Limit on page 1 of Part 1 of this Agreement, then your Account has a preset Spending Limit. If at any time your total balance exceeds this Spending Limit, we are more likely to decline to authorize your charges. We may approve charges that cause your total balance to exceed the Spending Limit. If we do, you must still pay us for those charges. We may also decline to authorize charges, even if they do not cause your total balance to exceed the Spending Limit. We may change or remove the Spending Limit at any time. | You may arrange for certain merchants and third parties to store your card number and expiration date, so that, for example:<br>● the merchant may charge your account at regular intervals; or<br>● you may make charges using that stored card information.<br>We may (but are not required to) tell these merchants and third parties if your expiration date or card number changes or if your account status is updated, including if your account is cancelled. If you do not want us to share your updated account information, please contact us using the number on the back of your card.<br><br>Keep your card safe and don't let anyone else use it. If your card is lost or stolen or your Account is being used without your permission, contact us right away. You may not use your Account for illegal activities. |
|---|---|---|
| **Promise to pay** | You promise to pay all charges, including:<br>● charges you make, even if you do not present your card or sign for the transaction,<br>● charges that other people make if you let them use your Account, and<br>● charges that Additional Cardmembers make or permit others to make. | |
| **Pay Over Time Limit** | If you have Pay Over Time, we assign a Pay Over Time Limit to your Account, which is shown on page 1 of Part 1 and on each billing statement. The Pay Over Time Limit applies to the total of your Pay Over Time, Cash Advance, and Plan balances. Your Pay Over Time balance cannot exceed your Pay Over Time Limit. If the addition of a charge would cause your Pay Over Time balance to exceed your Pay Over Time Limit, that charge will be added to your Pay In Full balance. When there is a delay in posting cash advances or plans to your Account, the total of your Pay Over Time, Cash Advance, and Plan balances may exceed your Pay Over Time Limit. The Pay Over Time Limit is not a spending limit. We may approve or decline a charge regardless of whether your Card Account balance is greater or less than your Pay Over Time Limit. We may increase or reduce your Pay Over Time Limit at any time. We may do so even if you pay on time and your Account is not in default. We will tell you if we change your Pay Over Time Limit. You must pay in full, by the Payment Due Date, all charges that are not added to a Pay Over Time, Cash Advance, or Plan balance. | |
| **Limits on Cash Advances** | Your Cash Advance balance may not exceed:<br>**Zync Card® $3,000**<br>**Green Card $3,000**<br>**Gold Card $6,000**<br>**Platinum Card® $8,000**<br>**Centurion® Card $10,000**<br><br>There may also be a limit on the amount of cash and number of times you can obtain cash from ATMs in a given period. You agree to manage your Account so that your Cash | Advance balance (including fees and interest) is not more than the Limit on Cash Advances.<br>For purposes of the Limits on Cash Advances, your Cash Advance balance will be determined by adding new cash advance transactions to the ending Cash Advance balance of the prior day.<br><br>In addition, we may not approve a cash advance transaction if it would cause the total of your Pay Over Time and/or Cash Advance balance and Plan balance to go over your Pay Over Time Limit. |

| | | |
|---|---|---|
| **Limits on person-to-person transaction** | Your person-to-person transactions may not exceed the following limits within any 30-day period:<br><br>**One from American Express® $2,000**<br><br>**Zync Card® $2,000**<br>**Green Card $2,000**<br>**Gold Card $2,000**<br><br>**Platinum Card® $4,000**<br><br>**Centurion® Card $5,000** | You agree to manage your Account so that the total of your person-to-person transactions in any 30-day period do not exceed the limit on person-to-person transactions.<br><br>We may not approve a person-to-person transaction if it would cause your Account to exceed the applicable person-to-person transaction limit. |

| | | |
|---|---|---|
| **Declined transactions** | We may decline to authorize a charge. Reasons we may do this include suspected fraud and our assessment of your creditworthiness. This may occur even if your Account is not in default. | We are not responsible for any losses you incur if we do not authorize a charge. And we are not responsible if any merchant refuses to accept the card. |

| | | |
|---|---|---|
| **About Pay Over Time** | If Pay Over Time is a feature of your Account, you may carry a balance with interest, up to your Pay Over Time Limit. Pay Over Time has two settings: active and inactive. You can change or view your Pay Over Time setting at any time through your online account or by calling the number on the back of your Card. Purchases made and Annual Membership Fees charged when Pay Over Time is set to inactive will be added to your Pay In Full balance, which will be due in full each month. If you have a Pay Over Time balance, you can choose each month to pay your Account Total New Balance in full, the Minimum Payment Due, or any amount in between. Charges will be added to your Pay Over Time balance as described below.<br><br>On the Transaction Date:If Pay Over Time is set to active at 8 p.m.ET on the transaction date provided by the merchant for an eligible charge, or on the date when an eligible Annual Membership Fee is charged to your Account, the charge will automatically be added to your Pay Over Time balance, subject to your Pay Over Time Limit. If the addition of an entire charge to your Pay Over Time balance would cause the total of your Pay Over Time, Cash Advance, and Plan balances to exceed your Pay Over Time Limit, that charge will be added to your Pay In Full balance. The transaction date provided by the merchant may differ from the date you made the purchase if, for example, there is a delay in the merchant submitting the transaction to us or if the merchant uses the shipping date as the transaction date. Charges with the same transaction date will be added to your Pay Over Time balance in any order we choose.<br><br>On your Closing Date:<br>Also, if on your Closing Date, 1) the total of your Pay Over Time, Cash Advance, and Plan balances is less than your Pay Over Time Limit, 2) Pay Over Time is set to active at 8 p.m. ET and 3) there are eligible new charges in your Pay In Full balance with a transaction date when Pay Over Time was set to active, you authorize us to automatically move all or a portion of those charges to your Pay Over Time balance, subject to your Pay Over Time Limit. If the addition of a charge to your Pay Over Time balance would cause the total of your Pay Over Time, Cash | Advance, and Plan balances to exceed your Pay Over Time Limit, we will move a portion of that charge to your Pay Over Time balance, up to your Pay Over Time Limit. The remaining portion of the charge will remain in your Pay In Full balance. Eligible charges will be moved to your Pay Over Time balance in order of the transaction dates. Charges with the same transaction date will be added to your Pay Over Time balance in any order we choose. A new charge, or a portion of a new charge, will not be eligible to be moved to your Pay Over Time balance on your Closing Date if:<br>● that charge is subject to a Foreign Transaction Fee;<br>● that charge or a portion of that charge is disputed (for a reason other than fraud) and that dispute is not resolved in the same billing period in which it was opened;<br>● that charge or a portion of that charge is reported as fraudulent;<br>● you created a plan for that charge using Plan It;<br>● Pay Over Time is suspended on your Account; or<br>● your Account is cancelled or enrolled in a payment program.<br><br>Certain charges are not eligible for Pay Over Time, such as cash advances and we may change the eligibility of other charges for Pay Over Time. We may suspend Pay Over Time at any time based on our assessment of your creditworthiness, the status of your Account, and/or your enrollment in a payment program. In addition, if your Account is past due or Pay Over Time is suspended, you will not be able to change your Pay Over Time setting from inactive to active.<br><br>If you transfer to a new Card with the same Account number, your Pay Over Time setting at time of transfer will remain in effect on your new Card.<br><br>If you have the Pay Over Time Travel feature on your Account: we will automatically add eligible travel-related purchases to your Pay Over Time Travel balance subject to your Pay Over Time Limit regardless of whether your Pay Over Time setting is active or inactive. If you request to cancel your Pay Over Time Travel feature, you will not be able to re-enroll. |

| | | |
|---|---|---|
| **About the Plan It feature** | We may offer you Plan It, which allows you to create a payment plan for qualifying purchases subject to a plan fee. This fee is a fixed finance charge that will be charged each month that a plan is active.<br><br>You may use this feature by selecting qualifying purchases and a plan duration. You will be able to view the monthly plan payments, including the plan fee, for your selection. Each plan fee will be disclosed before you create the applicable plan. If you create a plan for a purchase in your Pay Over Time balance, the purchase will be added to a plan balance and will be subject to a plan fee based on the APR that would otherwise apply to the purchase amount. If you create a plan for a purchase that is in your Pay In Full balance, the purchase will be added to a plan balance | and will be subject to a plan fee based on the APR that applies to the Pay Over Time feature at the time you create the plan. If you create a plan for a purchase that is divided between your Pay Over Time and Pay In Full balances, because only a portion of that purchase was moved to your Pay Over Time balance on your Closing Date, the purchase will be added to a plan balance and will be subject to a plan fee based on either the APR that would otherwise apply (to the portion of the purchase that was in your Pay Over Time balance) or the APR that applies to the Pay Over Time feature at the time you create the plan, whichever is lower.<br><br>A *qualifying purchase* for Plan It is a purchase of at least a specified dollar amount. Qualifying purchases |

do not include purchases of cash or cash equivalents, purchases subject to Foreign Transaction Fees, or any fee owed to us, such as Annual Fees.

Your ability to create plans will be based on a variety of factors such as your creditworthiness and your Pay Over Time Limit. You may not be able to create a plan if it would cause you to exceed your Pay Over Time Limit. You will not be able to create plans if your Pay Over Time feature is suspended or your Account is cancelled. You will not be able to create plans if one or more of your American Express Accounts is enrolled in a payment program, has a payment that is returned unpaid, or is past due. We will tell you the

number of active plans you may have, and we may change this number at any time. The plan durations offered to you, and your ability to include multiple qualifying purchases in a single plan, will be at our discretion and will be based on a variety of factors such as your creditworthiness, the purchase amount(s), and your Account history.

Plans cannot be cancelled after they have been created, but you can choose to pay them early by paying the Account Total New Balance shown on your most recent billing statement in full. If you pay a plan off early, you will not incur any future plan fees on that plan.

## About your payments

| | |
|---|---|
| **When you must pay** | You must pay the Amount Due, or Minimum Payment Due, if applicable, no later than the Payment Due Date shown on your billing statement to avoid a late payment fee. Each billing statement also states the time and manner by which you must make your payment for it to be credited as of the same day it is received. For your payment to be considered on time, we must receive it in such time and manner by the Payment Due Date shown on your billing statement.<br><br>Each billing statement also shows a Closing Date. The Closing Date is the last day of the billing period covered by the billing statement. Each Closing Date is about 30 days after the previous billing statement's Closing Date. |
| **How to make payments** | Make payments to us in U.S. dollars with:<br>● a single check drawn on a U.S. bank, or<br>● a single negotiable instrument clearable through the U.S. banking system, for example a money order, or<br>● an electronic payment that can be cleared through the U.S. banking system.<br><br>When making a payment by mail:<br>● make a separate payment for each account,<br>● mail your payment to the address shown on the payment coupon on your billing statement, and<br>● write your Account number on your check or negotiable instrument and include the payment coupon.<br><br>If your payment meets the above requirements, we will credit it to your Account as of the day we receive it, as long as we receive it by the time disclosed in your billing statement. If we receive it after that time, we will credit the payment on the day after we receive it.<br><br>If your payment does not meet the above requirements, there may be a delay in crediting your Account. This may result in late fees and additional interest charges (see the *Rates and Fees Table* and *How Rates, Fees and Pay Over Time Work* in Part 1).<br><br>We will not accept a payment made in a foreign currency or a payment drawn on an account at a bank located outside of the U.S.<br><br>If we process a late payment, a partial payment, or a payment marked with any restrictive language, that will have no effect on our rights and will not change this Agreement. |
| **How we apply payments and credits** | Your Account may have balances with different interest rates. For example, a Pay Over Time balance may have a lower interest rate than a Cash Advance balance. Your Account may also have Plan balances which are assessed plan fees. If your Account has balances with different interest rates, Plan balances, or plan fees, here is how we generally apply payments in a billing period:<br><br>We apply your payments - up to the Minimum Payment Due - first to the Pay in Full New Balance; then to any plan amounts included in your Minimum Payment Due; and then to the Pay Over Time and/or Cash Advance New Balance, first to the balance with the lowest interest rate and then to balances with higher interest rates.<br><br>After the Minimum Payment Due has been paid, we apply payments first to the Pay Over Time and/or Cash Advance balances with the highest interest rate and then to balances with lower interest rates, and then to any Plan balances.<br><br>In most cases, we apply a credit to the same balance as the related charge. We may apply payments and credits within balances, and among balances with the same interest rate, in any order we choose. If there is a negative balance in any balance on the account at the end of a billing period, that excess credit will be redistributed to other balances in accordance with how we apply payments described above. This means that in certain circumstances, Plan balances may get paid before they otherwise would. If you receive a credit for a purchase added to a plan, you must call us at the number on the back of your Card to have the credit applied to the Plan balance. |

## About your Minimum Payment Due

| | |
|---|---|
| **How we calculate your Minimum Payment Due** | The amount you owe each month is the sum of the following on your billing statement:<br>A. The Pay In Full New Balance<br>B. Any Pay Over Time and/or Cash Advance Minimum Due<br>C. Any Plan Payment Due<br>Above amounts include any past due amounts.<br><br>Your Pay Over Time and/or Cash Advance Minimum Due is the highest of:<br>**(1)** $40<br>**(2)** 2% of the Pay Over Time and/or Cash Advance New Balance<br>**(3)** The total calculated by following these steps: Use the Pay Over Time and/or Cash Advance New Balance minus the Interest charged on the billing statement as the *Amount* to calculate the sum of a. through d. below:<br>　a. 1% of the Amount from $0 through $20,000<br>　b. 2% of the Amount from $20,000.01 through $35,000<br>　c. 5% of the Amount from $35,000.01 through $50,000<br>　d. 10% of the Amount above $50,000 |

Then continue with the following steps:

e. Divide the sum from steps a. through d. by the Amount and round to four decimals

f. Multiply by the Amount

g. Add the Interest charged on the billing statement

Plus any Pay Over Time and/or Cash Advance amount past due.

Your Pay Over Time and/or Cash Advance Minimum Due will not exceed your Pay Over Time and/or Cash Advance New Balance. You may pay more than the Minimum Payment Due, up to your entire outstanding balance, at any time.

*EXAMPLE: You have: a Pay In Full New Balance of $200 and a Pay Over Time and/or Cash Advance New Balance of $30,300, which includes Interest of $300*

*1. $40*

*2. 2% multiplied by $30,300 equals $606*

*3. $30,300 minus $300 equals $30,000*

   *a. 1% multiplied by $20,000 equals $200*

   *b. 2% multiplied by ($30,000 minus $20,000) equals $200*

   *e. ($200 plus $200) divided by $30,000 equals 0.0133*

   *f. $30,000 multiplied by 0.0133 equals $399*

   *g. $399 plus $300 equals $699*

*The highest of 1., 2. or 3 is $699. The Pay Over Time and/or Cash Advance Minimum Due of $699 plus the Pay in Full New Balance of $200 together make up the Minimum Payment Due of $899.*

## About interest charges on Pay Over Time and Cash Advance balances

**When we charge interest**

We charge interest on Pay Over Time Balances as described below. For cash advances, we charge interest from the transaction date. You cannot avoid paying interest on cash advances.

For charges added automatically to a Pay Over Time balance at the time they post to your account, we charge interest from the transaction date until they are paid. For charges or portions of charges that we automatically move from your Pay In Full balance to your Pay Over Time balance on your Closing Date, we charge interest from the day after they are added to your Pay Over Time balance until they are paid. However, we will not charge interest on charges added automatically to your Pay Over Time balance in a billing period if:

- your Pay Over Time Previous Balance for the billing period is zero; or
- you paid the Account Total New Balance on your billing statement (if any) or Adjusted Balance (if you have an active plan created through Plan It) for each of the previous two billing periods in full by the Payment Due Date shown on each of those billing statements.

For Pay Over Time Select: we charge you interest on purchases added at your request to a Pay Over Time Select balance from the date they are added to a Pay Over Time Select balance until they are paid.

**How we calculate interest**

We calculate interest for a billing period by first figuring the interest on each balance. Balances within the Pay Over Time feature and Cash Advance balances may have different interest rates.

We use the **Average Daily Balance method (including new transactions)** to figure interest charges for each balance. The total interest charged for a billing period is the sum of the interest charged on each balance.

**Interest**

The interest charged for a balance in a billing period, except for variations caused by rounding, equals:

**(1)** Average Daily Balance (*ADB*) multiplied by

**(2)** Daily Periodic Rate (*DPR*) multiplied by

**(3)** number of days the DPR was in effect.

**ADB**

To get the ADB for a balance, we add up its *daily balances*. Then we divide the result by the number of days the DPR for that balance was in effect. If the daily balance is negative, we treat it as zero.

**DPR**

A DPR is 1/365th of an APR, rounded to one ten-thousandth of a percentage point. Your DPRs are shown in *How Rates and Fees Work* in Part 1.

*EXAMPLE: Calculating Interest*

*Assume that you have a single interest rate of 15.99%, your ADB is $2,250 and there are 30 days in the billing period.*

*The DPR is 15.99% divided by 365 days = 0.0438%*

*The Interest is $2,250 multiplied by 0.0438% multiplied by 30 days = $29.57*

**Daily Balance**

We figure the daily balance for each balance by:

- taking the beginning balance for the day,
- adding any new charges,
- subtracting any payments or credits; and
- making any appropriate adjustments.

We add a new charge to a daily balance as of its transaction date, except for charges automatically moved from your Pay In Full balance to your Pay Over Time balance on your Closing Date, which we add to a daily balance as of the day after they are moved to your Pay Over Time balance. If the daily balance is negative, we treat it as zero.

**Beginning balance**

For the first day of a billing period, the beginning balance is the ending balance for the prior billing period, including unpaid interest. For the rest of the billing period, the beginning balance is the previous day's daily balance *plus an amount of interest equal to the previous day's daily balance multiplied by the DPR for that balance. This method of figuring the beginning balance results in daily compounding of interest.*

**Other methods**

To figure the ADB and interest charges, we may use other formulas or methods that produce equivalent results. Also, we may choose not to charge interest on certain types of charges.

**Determining the Prime Rate**

We use the Prime Rate from the rates section of *The Wall Street Journal*. The Prime Rate for each billing period is the Prime Rate published in *The Wall Street Journal* on the Closing Date of the billing period.

*The Wall Street Journal* may not publish the Prime Rate on that day. If it does not, we will use the Prime Rate from the previous day it was published. If *The Wall Street Journal* is no longer published, we may use the Prime Rate from any other newspaper of general circulation in New York, New York. Or we may choose to use a similar published rate.

If the Prime Rate increases, variable APRs (and corresponding DPRs) will increase. In that case, you may pay more interest and may have a higher Minimum Payment Due. When the Prime Rate changes, the resulting changes to variable APRs take effect as of the first day of the billing period.

## Other important information

| **Military Lending Act** | Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: the costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee (other than certain participation fees for a credit card account). |
|---|---|
| | To listen to this statement, as well as a description of your payment obligation for this Account, call us at **855-531-0379.** |
| | If you are a covered borrower, the Claims Resolution section of this Agreement will not apply to you in connection with this Account. Instead, the *Claims Resolution for Covered Borrowers* section will apply. |

| **About Additional Cardmembers** | At your request, we may issue cards to Additional Cardmembers. They do not have accounts with us but they can use your Account subject to the terms of this Agreement. We may report an Additional Cardmember's use of your Account to credit reporting agencies. | If you want to cancel an Additional Cardmember's right to use your Account (and cancel their card) you must tell us. |
|---|---|---|
| | You are responsible for all use of your Account by Additional Cardmembers and anyone they allow to use your Account. You must pay for all charges they make. | If an Annual Membership fee applies for an Additional Card, please refer to the refund policy disclosed in the *Closing your Account* sub-section of your Cardmember Agreement. If a single Annual Membership fee applies for a group of Additional Cards on your Account, this policy will apply when you cancel the Additional Card on which the fee was assessed. If an Annual Membership fee applies to Additional Cards on your Account, it is shown on page 2 of Part 1 of the Cardmember Agreement. |
| | You authorize us to give Additional Cardmembers information about your Account and to discuss it with them. | |

| **Converting charges made in a foreign currency** | If you make a charge in a foreign currency, AE Exposure Management Ltd. ("AEEML") will convert it into U.S. dollars on the date we or our agents process it, so that we bill you for the charge in U.S. dollars based upon this conversion. Unless a particular rate is required by law, AEEML will choose a conversion rate that is acceptable to us for that date. The rate AEEML uses is no more than the highest official rate published by a government agency or the highest interbank rate AEEML identifies from customary banking sources on the conversion date or the prior business day. This rate may differ from rates that are in effect on the date of your charge. We will bill charges converted by establishments (such as airlines) at the rates they use. |
|---|---|

| **Changing your billing address** | You must notify us immediately if you change the: <br> • mailing address where we send billing statements; or <br> • e-mail address to which we send notice that your billing statement is available online. | If you have more than one account, you need to notify us separately for each account. <br><br> We may update your billing address if we receive information that it has changed or is incorrect. |
|---|---|---|

| **Closing your Account** | You may close your Account by calling us or writing to us. |
|---|---|
| | If an Annual Membership fee applies, we will refund this fee if you notify us that you are voluntarily closing your Account within 30 days of the Closing Date of the billing statement on which that fee appears. For cancellations after this 30 day period, the Annual Membership fee is non-refundable. If an Annual Membership fee applies to your Account, it is shown on page 1 and page 2 of Part 1 of the Cardmember Agreement. |
| | If your billing address is in the Commonwealth of Massachusetts at the time you close your account, this policy will not apply to you. |

| **Cancelling or suspending your Account** | We may: <br> • cancel your Account, <br> • suspend the ability to make charges, <br> • cancel or suspend any feature on your Account, and <br> • notify merchants that your Account has been cancelled or suspended. <br><br> If we do any of these, you must still pay us for all charges under the terms of this Agreement. | We may do any of these things at our discretion, even if you pay on time and your Account is not in default. <br><br> If your Account is cancelled, you must destroy your cards. <br><br> We may agree to reinstate your Account after a cancellation. If we do this, we may: <br> • reinstate any additional cards issued on your Account, <br> • charge you any applicable annual fees, and <br> • charge you a fee for reinstating the Account. |
|---|---|---|

| **About default** | We may consider your Account to be in default if: <br> • you violate a provision of this Agreement, <br> • you give us false information, <br> • you file for bankruptcy, <br> • you default under another agreement you have with us or an affiliate, <br> • you become incapacitated or die, or <br> • we believe you are unable or unwilling to pay your debts when due. | If we consider your Account in default, we may, to the extent permitted by federal and applicable state law: <br> • suspend your ability to make charges, <br> • cancel or suspend any feature on your Account, <br> • require you to pay more than your Minimum Payment Due immediately, and <br> • require you to pay your Account balance immediately. |
|---|---|---|

| **Collection costs** | You agree to pay all reasonable costs, including attorneys' fees, that we incur to collect amounts you owe. |
|---|---|

| **Credit reports** | You agree that we will obtain credit reports about you, investigate your ability to pay, and obtain information about you from other sources including information to verify and re-verify your employment and income. And you agree that we will use such information for any purposes (for example, marketing to you or evaluating you for a new account), subject to applicable law. |
|---|---|

You agree that we will give information about the Account to credit reporting agencies. We will tell a credit reporting agency if you fail to comply with any term of this Agreement. This may have a negative impact on your credit report.

If you believe information we have given to a credit reporting agency is incorrect, write to us at: American Express Credit Bureau Unit, P.O. Box 981537, El Paso, TX 79998-1537. When you write to us, tell us the specific information you believe is incorrect.

| | |
|---|---|
| **Sending you notices** | We mail you notices through the U.S. mail, postage prepaid, and address them to you at the latest billing address on our records. Any notice that we send you this way is deemed to be given when deposited in the U.S. mail. |
| **We may contact you** | **Servicing and Collections** <br> If we need to contact you to service your account or to collect amounts you owe, you authorize us (and our affiliates, agents and contractors, such as debt collection agencies and service providers) to contact you at any phone number or email address you provide, from which you contact us, or at which we believe we can reach you. We may contact you in any way, such as calling, texting, emailing, sending mobile application push notifications or using any other method of communication permitted by law. We may contact you using an automated dialer or prerecorded messages. We may contact you on a mobile, wireless or similar device, even if you are charged for it. <br><br> **Call monitoring** <br> We may monitor and record any calls between you and us. |
| **About insurance products** | We or our affiliates may tell you about insurance and non-insurance products, services or features that may have a fee. One of our affiliates may act on behalf of a provider of these products. The affiliate may be compensated for this. The insurance products are not offered or sold by us or on our behalf. Our affiliates may get additional compensation when AMEX Assurance Company or another affiliate is the insurer or reinsurer. Compensation may influence what products and providers we or our affiliates tell you about. <br><br> We may share information about you with our affiliates so they can identify products that may interest you. We may be compensated for this information. |
| **How we handle electronic debits from your checking account** | When you pay us by check, you authorize us to electronically deduct the amount from your bank or other asset account. We may process the check electronically by transmitting to your financial institution: <br> • the amount, <br> • the routing number, <br> • the account number, and <br> • the check serial number. | If we do this, your payment may be deducted from your bank or other asset account on the same day we receive your check. Also, you will not receive that cancelled check with your bank or asset account billing statement. <br><br> If we cannot collect the funds electronically, we may issue a draft against your bank or other asset account for the amount of the check. |
| **Privacy Act of 1974 notice** | Some federal agencies may accept the card under authority of statute. When you make charges at these agencies, we collect certain charge information. That information may be put to routine uses such as processing, billing and collections. It may also be aggregated for reporting, analysis and marketing use. Other routine uses by agencies may be published in the Federal Register. |
| **Changing benefits** | We have the right to add, modify or delete any benefit or service of your Account at our discretion. |
| **Assigning the Agreement** | We may sell, transfer or assign this Agreement and your Account. We may do so at any time without notifying you. You may not sell, assign or transfer your Account or any of your obligations under this Agreement. |
| **Assigning claims** | If you dispute a charge with a merchant, we may credit the Account for all or part of the disputed charge. If we do so, you assign and transfer to us all rights and claims (excluding tort claims) against the merchant. | You agree that you will not pursue any claim against the merchant for the credited amount. And you must cooperate with us if we decide to do so. |
| **We do not waive our rights** | We may choose to delay enforcing or to not exercise rights under this Agreement. If we do this, we do not waive our rights to exercise or enforce them on any other occasion. |
| **Governing law** | Utah law and federal law govern this Agreement and your Account. They govern without regard to internal principles of conflicts of law. We are located in Utah. We hold your Account in Utah. We entered into this Agreement with you in Utah. | In addition, if your billing address is in the State of Maryland, to the extent, if any, that Maryland law applies to your account, we elect to offer your card account pursuant to Title 12, Subtitle 9 of the Maryland Commercial Law Article. |
| **Notice to Oregon Residents** | Service charges not in excess of those permitted by law will be charged on the outstanding balances from month to month. You may pay more than the Minimum Payment Due, up to your entire outstanding balance, at any time. |
| **Notice for residents of Washington State** | In accordance with the Revised Code of Washington Statutes, Section 63.14.167, you are not responsible for payment of interest charges that result solely from a merchant's failure to transmit to us within seven working days a credit for goods or services accepted for return or forgiven if you have notified us of the merchant's delay in posting such credit, or our failure to post such credit to your account within three working days of our receipt of the credit. |

# Claims Resolution

Most customer concerns can be resolved by calling our Customer Service Department at the number listed on the back of your card. In the event Customer Service is unable to resolve a complaint to your satisfaction, this section explains how claims can be resolved through mediation, arbitration or litigation. It includes an arbitration provision. **You may reject the arbitration provision by sending us written notice within 45 days after your first card purchase. See _Your Right to Reject Arbitration_ below.**

For this section, **you** and **us** includes any corporate parents, subsidiaries, affiliates or related persons or entities. **Claim** means any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us, except for the validity, enforceability or scope of the Arbitration provision. **Claim** includes but is not limited to: (1) initial claims,

counterclaims, crossclaims and third-party claims; (2) claims based upon contract, tort, fraud, statute, regulation, common law and equity; (3) claims by or against any third party using or providing any product, service or benefit in connection with any account; and (4) claims that arise from or relate to (a) any account created under any of the agreements, or any balances on any such account, (b) advertisements, promotions or statements related to any accounts, goods or services financed under any accounts or terms of financing, (c) benefits and services related to card membership (including fee-based or free benefit programs, enrollment services and rewards programs) and (d) your application for any account. You may not sell, assign or transfer a claim.

## Sending a Claim Notice

Before beginning a lawsuit, mediation or arbitration, you and we agree to send a written notice (a *claim notice*) to each party against whom a claim is asserted, in order to provide an opportunity to resolve the claim informally or through mediation. Go to americanexpress.com/claim for a sample claim notice. The claim notice must describe the claim and state the specific relief demanded. Notice to you may be provided by your billing statement or sent to your billing address. Notice to us must include your name, address and Account number and be sent to American Express ADR c/o CT Corporation System, 28 Liberty Street, New York, New York 10005. If the claim proceeds to arbitration, the amount of any relief demanded in a claim notice will not be disclosed to the arbitrator until after the arbitrator rules.

## Mediation

In mediation, a neutral mediator helps parties resolve a claim. The mediator does not decide the claim but helps parties reach agreement. Before beginning mediation, you or we must first send a claim notice. Within 30 days after sending or receiving a claim notice, you or we may submit the claim to JAMS (1-800-352-5267, jamsadr.com) or the American Arbitration Association ("AAA") (1-800-778-7879, adr.org) for mediation. We will pay the fees of the mediator.

All mediation-related communications are confidential, inadmissible in court and not subject to discovery.

All applicable statutes of limitation will be tolled from the date you or we send the claim notice until termination of the mediation. Either you or we may terminate the mediation at any time. The submission or failure to submit a claim to mediation will not affect your or our right to elect arbitration.

## Arbitration

You or we may elect to resolve any claim by individual arbitration. Claims are decided by a neutral arbitrator.

**If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim. Further, you and we will not have the right to participate in a representative capacity or as a member of any class pertaining to any claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's authority is limited to claims between you and us alone. Claims may not be joined or consolidated unless you and we agree in writing. An arbitration award and any judgment confirming it will apply only**

**to the specific case and cannot be used in any other case except to enforce the award. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration.**

### Initiating Arbitration

Before beginning arbitration, you or we must first send a claim notice. Claims will be referred to either JAMS or AAA, as selected by the party electing arbitration. Claims will be resolved pursuant to this Arbitration provision and the selected organization's rules in effect when the claim is filed, except where those rules conflict with this Agreement. If we choose the organization, you may select the other within 30 days after receiving notice of our selection. Contact JAMS or AAA to begin an arbitration or for other information. Claims also may be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the Federal Arbitration Act, 9 U.S.C. sec. 1-16 (*FAA*). We will not elect arbitration for any claim you file in small claims court, so long as the claim is individual pending only in that court. You or we may otherwise elect to arbitrate any claim at any time unless it has been filed in court and trial has begun or final judgment has been entered. Either you or we may delay enforcing or not exercise rights under this Arbitration provision, including the right to arbitrate a claim, without waiving the right to exercise or enforce those rights.

### Limitations on Arbitration

**If either party elects to resolve a claim by arbitration, that claim will be arbitrated on an individual basis. There will be no right or authority for any claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of the general public, other cardmembers or other persons similarly situated.**

Notwithstanding any other provision and without waiving the right to appeal such decision, if any portion of these *Limitations on Arbitration* is deemed invalid or unenforceable, then the entire Arbitration provision (other than this sentence) will not apply.

### Arbitration Procedures

This Arbitration provision is governed by the FAA. The arbitrator will apply applicable substantive law, statutes of limitations and privileges. The arbitrator will not apply any federal or state rules of civil procedure or evidence in matters relating to evidence or discovery. Subject to the *Limitations on Arbitration,* the arbitrator may otherwise award any relief available in court. You and we agree that the arbitration will be confidential. You and we agree that we will not disclose the content of the arbitration proceeding or its outcome to anyone, but you or we may notify any government authority of the claim as permitted or required by law. If your claim is for $10,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents, through a telephonic hearing, or by an in-person hearing. At any party's request, the arbitrator will provide a brief written explanation of the award. The arbitrator's award will be final and binding, subject to each party's

right to appeal as stated in this section and/or to challenge or appeal an arbitration award pursuant to the FAA. To initiate an appeal, a party must notify the arbitration organization and all parties in writing within 35 days after the arbitrator's award is issued. The arbitration organization will appoint a three-arbitrator panel to decide anew, by majority vote based on written submissions, any aspect of the decision objected to. The appeal will otherwise proceed pursuant to the arbitration organization's appellate rules. Judgment upon any award may be entered in any court having jurisdiction. At your election, arbitration hearings will take place in the federal judicial district of your residence.

### Arbitration Fees and Costs

You will be responsible for paying your share of any *arbitration fees* (including filing, administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought a claim in court. We will be responsible for any additional arbitration fees. At your written request, we will consider in good faith making a temporary advance of your share of any arbitration fees, or paying for the reasonable fees of an expert appointed by the arbitrator for good cause.

### Additional Arbitration Awards

If the arbitrator rules in your favor for an amount greater than any final offer we made before the final hearing in arbitration, the arbitrator's award will include:

(1) any money to which you are entitled, but in no case less than $5,000; and (2) any reasonable attorneys' fees, costs and expert and other witness fees.

### Your Right to Reject Arbitration

You may reject this Arbitration provision by sending a written *rejection notice* to us at: American Express, P.O. Box 981556, El Paso, TX 79998. Go to americanexpress.com/reject for a sample rejection notice. Your rejection notice must be mailed within 45 days after your first card purchase. Your rejection notice must state that you reject the Arbitration provision and include your name, address, Account number and personal signature. No one else may sign the rejection notice. If your rejection notice complies with these requirements, this Arbitration provision and any other arbitration provisions in the cardmember agreements for any other currently open American Express accounts you have will not apply to you, except for Corporate Card accounts and any claims subject to pending litigation or arbitration at the time you send your rejection notice. Rejection of this Arbitration provision will not affect your other rights or responsibilities under this Claims Resolution section or the Agreement. Rejecting this Arbitration provision will not affect your ability to use your card or any other benefit, product or service you may have with your Account.

### Continuation

This section will survive termination of your Account, voluntary payment of your Account balance, any legal proceeding to collect a debt, any bankruptcy and any sale of your Account (in the case of a sale, its terms will apply to the buyer of your Account). If any portion of this Claims Resolution section, except as otherwise provided in the *Limitations on Arbitration* subsection, is deemed invalid or unenforceable, it will not invalidate the remaining portions of this Claims Resolution section.



# Claims Resolution for Covered Borrowers

Most customer concerns can be resolved by calling our Customer Service Department at the number listed on the back of your Card. In the event Customer Service is unable to resolve a complaint to your satisfaction, this section explains how claims can be resolved through litigation, non-binding mediation or, at your election, arbitration. You are not required to resolve any claims by mediation and arbitration. For this section, *you* and *us* includes any corporate parents, subsidiaries, affiliates or related persons or entities. *Claim* means any current or future claim, dispute or controversy relating to your Card account, this Agreement, or any agreement or relationship you have or had with us, except for the validity, enforceability or scope of the Arbitration provision. *Claim* includes but is not limited to: (1) initial claims, counterclaims, cross-claims and third-party claims; (2) claims based upon contract, tort, fraud, statute, regulation, common law and equity; (3) claims by or against any third party using or providing any product, service or benefit in connection with any account; and (4) claims that arise from or relate to (a) any account created under any of the agreements or any balances on any such account, (b) advertisements, promotions or statements related to any accounts, goods or services financed under any accounts or terms of financing, (c) benefits and services related to Card membership (including fee-based or free benefit programs, enrollment services and rewards programs) and (d) your application for any account. You may not sell, assign or transfer a claim.

## Sending a Claim Notice
Before beginning a lawsuit, arbitration or non-binding mediation, you may send a written notice (a *claim notice*) to us. Go to americanexpress.com/claim for a sample claim notice. The claim notice should describe the claim and state the specific relief demanded. We may also request that we resolve a claim by mediation or arbitration, but you are not required to accept our request. We may include our request with your billing statement or mail it to your home address. Notice to us must include your name, address and Account number and be sent to American Express ADR c/o CT Corporation System, 28 Liberty Street, New York, New York 10005. If the claim proceeds to litigation, mediation or arbitration, the amount of any relief demanded in a claim notice will not be disclosed. *You are not required to resolve your claim through mediation or arbitration. You may decline our request to resolve a claim through mediation or arbitration. You may elect to resolve your claim through litigation.*

## Mediation
If you elect to resolve your claim through mediation, a neutral mediator will help resolve the claim. The mediator does not decide the claim but helps parties reach agreement. Before beginning mediation, you or we must first send a claim notice. Within 30 days after sending or receiving a claim notice, you or we may submit the claim to JAMS (1-800-352-5267, jamsadr.com)

or the American Arbitration Association ("AAA") (1-800-778-7879, adr.org) for mediation. We will pay the fees of the mediator. All mediation-related communications are confidential, inadmissible in court and not subject to discovery. All applicable statutes of limitation will be tolled from the date you or we send the claim notice until termination of the mediation. Either you or we may terminate the mediation at any time. The submission or failure to submit a claim to mediation will not affect your or our right to elect litigation or arbitration. *The outcome of mediation proceedings is non-binding. You may proceed to litigation or arbitration regardless of the outcome of mediation.*

## Arbitration
You may elect, but are not required, to resolve any claim by individual arbitration. We may also request to resolve any claim by individual arbitration, but you are not required to accept our request. Claims are decided by a neutral arbitrator.

**If you elect or agree to resolve a claim through arbitration, your or our right to litigate that claim in court or have a jury trial on that claim may be limited. Further, you and we may not have the right to participate in a representative capacity or as a member of any class pertaining to any claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's authority is limited to claims between you and us alone. Claims may not be joined or consolidated unless you and we agree in writing. An arbitration award and any judgment confirming it will apply only to the specific case and cannot be used in any other case except to enforce the award. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration.**

### Initiating Arbitration
If you and we agree to proceed to arbitration, claims will be referred to either JAMS or AAA, as selected by the party electing arbitration. Claims will be resolved pursuant to this Arbitration provision and the selected organization's rules in effect when the claim is filed, except where those rules conflict with this Agreement. If we choose the organization, you may select the other within 30 days after receiving notice of our selection. Contact JAMS or AAA to begin an arbitration or for other information.
Claims also may be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the Federal Arbitration Act, 9 U.S.C. sec. 1-16 (*FAA*). We will not request arbitration for any claim you file in small claims

court, so long as the claim is individual and pending only in that court. You may otherwise elect to arbitrate any claim at any time unless it has been filed in court and trial has begun or final judgment has been entered.

### Limitations on Arbitration
**If the parties agree to resolve a claim by arbitration, that claim will be arbitrated on an individual basis pursuant to that agreement, and the agreement would not allow claims to be arbitrated on a class action basis or on bases involving claims brought in a purported representative capacity on behalf of the general public, other Cardmembers, or other persons similarly situated.**

Notwithstanding any other provision and without waiving the right to appeal such decision, if any portion of these *Limitations on Arbitration* provisions is deemed invalid or unenforceable, then the entire Arbitration provision (other than this sentence) will not apply.

### Arbitration Procedures
This Arbitration provision is governed by the FAA. The arbitrator will apply applicable substantive law, statutes of limitations and privileges. The arbitrator will not apply any federal or state rules of civil procedure or evidence in matters relating to evidence or discovery. Subject to the *Limitations on Arbitration* provisions, the arbitrator may otherwise award any relief available in court. You and we agree that the arbitration will be confidential. You and we agree that we will not disclose the content of the arbitration proceeding or its outcome to anyone, but you or we may notify any government authority of the claim as permitted or required by law.

If your claim is for $10,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents, through a telephonic hearing, or by an in person hearing. At any party's request, the arbitrator will provide a brief written explanation of the award. The arbitrator's award will be final and binding, subject to each party's right to appeal as stated in this section and/or to challenge or appeal an arbitration award pursuant to the FAA. To initiate an appeal, a party must notify the arbitration organization and all parties in writing within 35 days after the arbitrator's award is issued. The arbitration organization will appoint a three-arbitrator panel to decide anew, by majority vote based on written submissions, any aspect of the decision objected to. The appeal will otherwise proceed pursuant to the arbitration organization's appellate rules. Judgment upon any award may be entered in any court having jurisdiction. At your election, arbitration hearings will take place in the federal judicial district of your residence.

### Arbitration Fees and Costs
You will be responsible for paying your share of any *arbitration fees* (including filing,

administrative, hearing or other fees), but only up to the amount of the filing fees you would have incurred if you had brought a claim in court. We will be responsible for any additional arbitration fees. At your written request, we will consider in good faith making a temporary advance of your share of any arbitration fees, or paying for the reasonable fees of an expert appointed by the arbitrator for good cause.

**Additional Arbitration Awards**

If the arbitrator rules in your favor for an amount greater than any final offer we made before the final hearing in arbitration, the arbitrator's award will include:

(1) any money to which you are entitled, but in no case less than $5,000; and (2) any reasonable attorneys' fees, costs and expert and other witness fees.

**Continuation**

This section will survive termination of your Account, voluntary payment of your Account balance, any legal proceeding to collect a debt, any bankruptcy and any sale of your Account (in the case of a sale, its terms will apply to the buyer of your Account). If any portion of this Claims Resolution section, except as otherwise provided in the *Limitations on Arbitration* subsection, is deemed invalid or unenforceable, it will not invalidate the remaining portions of this Claims Resolution section.

# Attachment #2: Amex GCO E-mail Chain

## RE: Claim Notice for Platinum Card / Confidential Settlement Communication

From: TJClark (tamahjclark@yahoo.com)

To: jennifer.fell@aexp.com

Cc: mia.figueroa@aexp.com

Date: Wednesday, February 26, 2025 at 04:03 PM EST

Hello Jennifer,

It occurred to me that Amex must have felt as though I was somehow a threat to them. But I did not and do not intend Amex any harm.

I apologize if I offended you by not taking your call last week, but I was very sick. And I was looking for a follow-up from you in one form or another (in reply to my email last week) which never came.

Amex is not my enemy and I am not Amex's enemy. We have had a long, positive relationship that I would prefer to maintain. Canceling my account does not resolve anything. It is only a sad, unfortunate way to unnecessarily end a friendship with someone who sincerely means you well.

I am aware that Amex must protect itself from any perceived threat to mitigate any potential losses. However, alienating a friend is not the best option, in my humble opinion. If I wanted to file a class-action lawsuit or do anything else that would expose Amex to any harm, then I would have already taken that route.

Instead, I chose to patiently and respectfully work with my friend. Imagine my shock and confusion when my friend did not choose to work with me in return. Page 7 of the Platinum Card Member Agreement (Claims Resolution) says *"[t]his section will survive termination of your Account"*. This means we would still need to mediate, arbitrate, or litigate. But why do any of that when the matter could be quickly, confidentially, peacefully resolved between us?

Mediation would require Amex pay the expenses, per the Agreement. Litigation is unnecessary and would be both time-consuming and expensive for Amex. It could also set a dangerously unfavorable legal precedence that could expose Amex to great financial loss and cause the brand to lower its high reputational standard -- and for what? Why risk it? Why should we go through any of that?

Closing my account and not requiring payment of the disputed transaction total of $5,597.73 does not resolve the claim. And it does not address the more pertinent legal issues that I mentioned in my Claim Notice which federal law says could result in fines and imprisonment under 15 USC 1611(1) It only shocks, confuses, and alienates a long-time friend.

Jennifer, I hope you truly consider what I am saying because it is always best for friends to work together. If needed, I can give you time to think everything over. Please just let me know how you would like to proceed. Thank you.

-------- Original message --------
From: TJClark <tamahjclark@yahoo.com>
Date: 2/26/25 11:36 AM (GMT-05:00)
To: Jennifer Fell <Jennifer.Fell@aexp.com>

Cc: Mia Figueroa <Mia.Figueroa@aexp.com>
Subject: RE: Claim Notice for Platinum Card / Confidential Settlement Communication

Good Morning Jennifer,

Although Amex canceled the account, that does not resolve any claims. The claims survive the termination of the Agreement. In addition, there are a number of claims that can arise from retaliatory acts connected to a consumer simply requesting Amex comply with applicable federal financial laws. Thank you.

-------- Original message --------
From: TJClark <tamahjclark@yahoo.com>
Date: 2/26/25 10:10 AM (GMT-05:00)
To: Jennifer Fell <Jennifer.Fell@aexp.com>
Cc: Mia Figueroa <Mia.Figueroa@aexp.com>
Subject: RE: Claim Notice for Platinum Card / Confidential Settlement Communication

Good Morning Jennifer,

I received notification this morning that my account was canceled.

I am unable to update my mailing address. Please update my mailing address for all final account communications to:

6595 Roswell Road, #G-6436
Atlanta, GA 30328


Thank you and kind regards.

-------- Original message --------
From: TJClark <tamahjclark@yahoo.com>
Date: 2/20/25 3:47 PM (GMT-05:00)
To: Jennifer Fell <Jennifer.Fell@aexp.com>
Cc: Mia Figueroa <Mia.Figueroa@aexp.com>
Subject: RE: Claim Notice for Platinum Card / Confidential Settlement Communication

Good Afternoon Jennifer,

I am sorry to hear about David and hope all is well.

Right now, I am under the weather and cannot focus.

You are welcome to email me, but note that it will be a few days before I respond.

I apologize for the delay in advance. Thank you.

-------- Original message --------
From: Jennifer Fell <Jennifer.Fell@aexp.com>
Date: 2/20/25 3:15 PM (GMT-05:00)

To: tamahjclark@yahoo.com
Cc: Mia Figueroa <Mia.Figueroa@aexp.com>
Subject: RE: Claim Notice for Platinum Card / Confidential Settlement Communication


Good afternoon Ms. Clark,


Thank you for your patience as American Express further reviewed your email and request below. Please note that my colleague David Switzler is currently on an extended leave of absence. Therefore, this matter was transferred to me and I, along with my colleague Mia Figueroa, will be handling your claim going forward. I am up to speed on the matter and would like to discuss your claim and settlement demand below in further detail.


Are you available for a brief call with me this week or perhaps early next week?


Looking forward to hearing from you.


Cordially,
Jennifer


JENNIFER FELL (SHE/HER) | DIRECTOR & LITIGATION COUNSEL

GLOBAL LITIGATION & INVESTIGATIONS TEAM

GENERAL COUNSEL'S ORGANIZATION

AMERICAN EXPRESS, COLLEAGUE SINCE '16

E: jennifer.fell@aexp.com


**From:** TJClark <tamahjclark@yahoo.com>
**Sent:** Tuesday, November 26, 2024 4:39 PM

**To:** David DeSales Switzler <David.D.Switzler@aexp.com>
**Subject:** RE: Claim Notice for Platinum Card

Good Afternoon,

Thank you for your email.

I would, of course, be willing to sign a confidentiality and non-disparagement agreement. I have no desire or intention to "bad-mouth" American Express or in any way divulge this matter to anyone.

If you are offering the stated goodwill credit and removing the charge from my statement, I am happy to sign your Release today. But if you are stating the charge would be re-applied to my statement minus the stated goodwill credit, then the matter has become slightly more complicated.

Aside from the 60-day chargeback policy that I learned of after-the-fact, there were other issues at hand that have a direct and indirect bearing on this matter. For these reasons, I may not be able to accept your settlement at this time.

Thank you for your time.

-------- Original message --------

From: David DeSales Switzler <David.D.Switzler@aexp.com>

Date: 11/26/24 11:41 AM (GMT-05:00)

To: TJClark <tamahjclark@yahoo.com>

Cc: Mia Figueroa <Mia.Figueroa@aexp.com>

Subject: RE: Claim Notice for Platinum Card

Thank you, Ms. Clark. And thank you for your patience. It appears from our records that the charge that is the subject of this dispute was made on February 16, 2024, and that the dispute in question was not made until July 15, 2024—well beyond the 60-day dispute period—and accordingly was denied. Notwithstanding, and in effort to resolve this matter, we are willing to offer you a good will statement credit of $3,000.00 in exchange for a release and subject to a settlement agreement that contains, among other provisions, a confidentiality and nondisparagement provision. Please let us know whether you accept, and we will promptly prepare the agreement for your execution.

**DAVID D. SWITZLER** | DIRECTOR & COUNSEL

GENERAL COUNSEL'S ORGANIZATION

AMERICAN EXPRESS
E: david.d.switzler@aexp.com

---

**From:** TJClark <tamahjclark@yahoo.com>
**Sent:** Tuesday, October 29, 2024 5:57 PM
**To:** David DeSales Switzler <David.D.Switzler@aexp.com>
**Cc:** Mia Figueroa <Mia.Figueroa@aexp.com>
**Subject:** RE: Claim Notice for Platinum Card

Hi David,

Thank you for the clarification.

The reservation ID is HM35RPJHAZ. Please let me know what other questions you may have. Thank you.

-------- Original message --------

From: David DeSales Switzler <David.D.Switzler@aexp.com>

Date: 10/29/24 3:12 PM (GMT-05:00)

To: TJClark <tamahjclark@yahoo.com>

Cc: Mia Figueroa <Mia.Figueroa@aexp.com>

Subject: RE: Claim Notice for Platinum Card


Hi Ms. Clark. I am an attorney working in-house in the General Counsel's Organization at American Express. I am happy to speak with you directly, and can do so tomorrow afternoon after 4pm Eastern, or any time at all on Thursday. Or if you would feel more comfortable communicating through an attorney, I am happy to go that route as well. Our questions relate to which of your three reservations the disputed charge relates to as it is unclear from what I have thus far been able to review, and thought a quick call might help crystalize things in my mind as we finalize review and evaluation of your claim.


**DAVID D. SWITZLER** | DIRECTOR & COUNSEL

GENERAL COUNSEL'S ORGANIZATION

AMERICAN EXPRESS
E: david.d.switzler@aexp.com


---

**From:** TJClark <tamahjclark@yahoo.com>
**Sent:** Tuesday, October 29, 2024 2:28 PM
**To:** David DeSales Switzler <David.D.Switzler@aexp.com>
**Cc:** Mia Figueroa <Mia.Figueroa@aexp.com>
**Subject:** RE: Claim Notice for Platinum Card


Hi David,


I noticed your title is Director and Counsel. Does that mean you are a lawyer? If so, would it be more appropriate for a lawyer to speak with you or should I just speak with you myself? Thank

you.

-------- Original message --------

From: David DeSales Switzler <David.D.Switzler@aexp.com>

Date: 10/29/24 10:16 AM (GMT-05:00)

To: TamahJClark@yahoo.com

Cc: Mia Figueroa <Mia.Figueroa@aexp.com>

Subject: Claim Notice for Platinum Card

Good morning Ms. Clark. We are in receipt of correspondence entitled "Claim Notice for Platinum Card Ending in -08007" and write in hopes of obtaining a bit more information from you regarding your claim. We have reviewed the documentation available to us, but would benefit from a brief call at your convenience to help us pin down a few details. Please let me know when you might be available for a call, and a number at which I may reach you.

Thank you,

DAVID D. SWITZLER | DIRECTOR & COUNSEL

GENERAL COUNSEL'S ORGANIZATION

AMERICAN EXPRESS
E: david.d.switzler@aexp.com

*American Express made the following annotations*

*This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.*

*American Express Prospective and Existing Customers: For more information about how we protect your privacy, please visit www.americanexpress.com/privacy. If you are located outside the U.S., please select your location at www.americanexpress.com/change-country/ and access the privacy link at the bottom of the page.*

*American Express a ajouté le commentaire suivant*

*Ce courrier et toute pièce jointe qu'il contient sont réservés au seul destinataire indiqué et peuvent contenir des renseignements confidentiels et protégés par le secret professionnel. Si vous n'êtes pas le destinataire prévu, toute divulgation, duplication, utilisation ou distribution du courrier ou de toute pièce jointe est interdite. Si vous avez reçu cette communication par erreur, veuillez nous en aviser par courrier et détruire immédiatement le courrier et les pièces jointes.*

*Clients et prospects d'American Express: Pour plus d'informations sur la façon dont nous protégeons votre vie privée, veuillez visiter www.americanexpress.com/privacy. Si vous êtes situé à l'extérieur des États-Unis, veuillez sélectionner votre emplacement à l'adresse www.americanexpress.com/change-country/ et accéder au lien de confidentialité en bas de la page.*

*American Express made the following annotations*

*This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.*

*American Express Prospective and Existing Customers: For more information about how we protect your privacy, please visit www.americanexpress.com/privacy. If you are located outside the U.S., please select your location at www.americanexpress.com/change-country/ and access the privacy link at the bottom of the page.*

*American Express a ajouté le commentaire suivant*

*Ce courrier et toute pièce jointe qu'il contient sont réservés au seul destinataire indiqué et peuvent contenir des renseignements confidentiels et protégés par le secret professionnel. Si*

*vous n'êtes pas le destinataire prévu, toute divulgation, duplication, utilisation ou distribution du courrier ou de toute pièce jointe est interdite. Si vous avez reçu cette communication par erreur, veuillez nous en aviser par courrier et détruire immédiatement le courrier et les pièces jointes.*

*Clients et prospects d'American Express: Pour plus d'informations sur la façon dont nous protégeons votre vie privée, veuillez visiter www.americanexpress.com/privacy. Si vous êtes situé à l'extérieur des États-Unis, veuillez sélectionner votre emplacement à l'adresse www.americanexpress.com/change-country/ et accéder au lien de confidentialité en bas de la page.*

*American Express made the following annotations*

*This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.*

*American Express Prospective and Existing Customers: For more information about how we protect your privacy, please visit www.americanexpress.com/privacy. If you are located outside the U.S., please select your location at www.americanexpress.com/change-country/ and access the privacy link at the bottom of the page.*

*American Express a ajouté le commentaire suivant*

*Ce courrier et toute pièce jointe qu'il contient sont réservés au seul destinataire indiqué et peuvent contenir des renseignements confidentiels et protégés par le secret professionnel. Si vous n'êtes pas le destinataire prévu, toute divulgation, duplication, utilisation ou distribution du courrier ou de toute pièce jointe est interdite. Si vous avez reçu cette communication par erreur, veuillez nous en aviser par courrier et détruire immédiatement le courrier et les pièces jointes.*

*Clients et prospects d'American Express: Pour plus d'informations sur la façon dont nous protégeons votre vie privée, veuillez visiter www.americanexpress.com/privacy. Si vous êtes situé à l'extérieur des États-Unis, veuillez sélectionner votre emplacement à l'adresse www.americanexpress.com/change-country/ et accéder au lien de confidentialité en bas de la page.*

*American Express made the following annotations*

*This message and any attachments are solely for the intended recipient and may contain confidential or privileged*

information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.

American Express Prospective and Existing Customers: For more information about how we protect your privacy, please visit www.americanexpress.com/privacy. If you are located outside the U.S., please select your location at www.americanexpress.com/change-country/ and access the privacy link at the bottom of the page.

American Express a ajouté le commentaire suivant

Ce courrier et toute pièce jointe qu'il contient sont réservés au seul destinataire indiqué et peuvent contenir des renseignements confidentiels et protégés par le secret professionnel. Si vous n'êtes pas le destinataire prévu, toute divulgation, duplication, utilisation ou distribution du courrier ou de toute pièce jointe est interdite. Si vous avez reçu cette communication par erreur, veuillez nous en aviser par courrier et détruire immédiatement le courrier et les pièces jointes.

Clients et prospects d'American Express: Pour plus d'informations sur la façon dont nous protégeons votre vie privée, veuillez visiter www.americanexpress.com/privacy. Si vous êtes situé à l'extérieur des États-Unis, veuillez sélectionner votre emplacement à l'adresse www.americanexpress.com/change-country/ et accéder au lien de confidentialité en bas de la page.

## Attachment #3:  Account Cancellation

### Important account notice

From:   American Express (americanexpress@welcome.americanexpress.com)

To:      tamahjclark@yahoo.com

Date:   Wednesday, February 26, 2025 at 09:50 AM EST

Details inside



**TAMAH J CLARK**
Account ending: 08007





Account cancellation notice

We are writing to inform you that, after a recent review of your American Express® account(s) referenced above, we have cancelled the account(s) based on our adherence to regulatory guidelines.

Due to the nature of this cancellation, the account(s) listed above, and any other accounts if applicable, will not be eligible for reinstatement.

**It's important to note**
You have up to 90 days from the date of this email to redeem any eligible earned rewards on your accounts. Please ensure that any Additional Card Members are aware that the account has been cancelled.

Keep in mind, you remain legally obligated to pay American Express for all charges incurred on the account(s) listed above under the terms of the Cardmember Agreement.

**Contacting us**
To redeem your eligible earned rewards within 90 days of this email, please call 1-800-950-8623. The hours of operation are Monday to Friday, 9am -5pm ET. You can also write to us at the address below:

American Express
P.O. Box 981535
El Paso, TX 79998-1535

Sincerely,

**American Express**

Privacy statement

Contact us

Update your email address

**Notice to U.S. Residents.**

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning American Express National Bank is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, D.C.20552 (the "Bureau"). The federal agencies that administer compliance with this law concerning American Express Travel Related Services Company, Inc. are the Bureau (address above) and the Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue NW, Washington, D.C. 20580.

SAM0INF041

## Attachment #4: Claim Notice



**USPS CERTIFIED MAIL**

9207 1901 4298 0406 7191 19



0010177550000011
American Express ADR
c/o CT Corporation System
28 Liberty Street
New York NY 10005
USA

**TAMAH JADA CLARK**



E-mail:

**Sent via Certified Mail®#:**

___9214 8901 4298 0406 7190 71___

Thursday, August 22, 2024

To:

American Express ADR
c/o CT Corporation System
28 Liberty Street
New York, New York 10005

**Claim Notice for Platinum Card Ending in -08007**
(In Accordance with Platinum Card® Cardmember Agreement and <u>12 CFR § 1026.12(c)(1)</u>)

I previously had a dispute with a merchant who failed to satisfactorily resolve the dispute for a transaction totaling $5,597.73. I have even tried to resolve the matter through American Express' chargeback/dispute process several times (Ref. No. D-65609690). However, American Express failed to investigate the dispute and failed to follow federal law (i.e. Fair Credit Billing Act/FCBA and Truth in Lending Act/TILA) as outlined in my two letters to the American Express Dispute Team. <u>*See*</u> **Exhibit A: Request to Reopen Dispute**, and **Exhibit B: Request for Detailed Letter** attached.

I am writing to inform you that I am asserting my claim for the full amount of $5,597.73 against American Express and withholding payment for that amount in accordance with <u>12 CFR § 1026.12(c)(1)</u>, which reads as follows:

> *"When a person who honors a credit card fails to resolve satisfactorily a dispute as to property or services purchased with the credit card in a consumer credit transaction, the* ***cardholder may assert against the card issuer all claims*** *(other than tort claims) and defenses arising out of the transaction and relating to the failure to resolve the dispute. The* ***cardholder may withhold payment up to the amount of credit outstanding for the***

1

***property or services*** *that gave rise to the dispute and any finance or other charges imposed on that amount."*

Since American Express failed to comply with federal law, I cannot be rebilled for the dispute/ claim amount of $5,597.73. Pursuant <u>15 U.S.C. § 1666(e)</u>: *"Any creditor who fails to comply with the requirements of this section or section 1666a of this title forfeits any right to collect from the obligor the amount indicated by the obligor under paragraph (2) of subsection (a) of this section".*

As a result of the foregoing, I am demanding relief in the form of the total disputed/claimed amount of $5,597.73 being permanently credited to my account or a check being written to me from American Express to reimburse me for the amount of $5,597.73. Thank you.

Sincerely,

<u>/s/ Tamah Jada Clark</u>
Tamah Jada Clark

2

## Request to Reopen Dispute
### Ref. No. D-65609690

**Monday, July 22, 2024**

I was notified that this dispute was closed a few moments ago and the following reason was provided: "As per your CM Agreement and/or merchant policies, we are unable to investigate this charge. Please contact the merchant directly." However, the reason is unacceptable because it is inaccurate and not agreeable with federal law (i.e. **Fair Credit Billing Act/FCBA** and **Truth in Lending Act/TILA**).

Under 15 U.S.C. § 1631, a creditor (e.g. Amex) is required to make certain disclosures,[1] including the process for disputing transactions and my right to initiate a chargeback for a product or service not received.  I was supposed to receive a "statement, in a form prescribed by regulations of the Bureau of the protection provided by sections 1666 and 1666i of this title to an obligor and the creditor's responsibilities under sections 1666a and 1666i of this title." (*See* 15 U.S.C. § 1637(7)).

Section 1666 is the codification of the FCBA and outlines the procedure for the correction of billing errors. Amex never provided me this information. Instead, I was told I had at least 120 days to dispute a transaction, but that this limit does not apply when the product or service was not received. Furthermore, I was reassured that I am not responsible to pay for services not received. This is what customer service agents state and what Amex publicly advertises, as can be seen at the links below.

- American Express Merchant Operating Guide, United States Region, April 2024: https://icm.aexp-static.com/content/dam/gms/en_us/optblue/us-mog.pdf
- American Express Merchant Reference Guide, U.S., April 2024: https://www.americanexpress.com/content/dam/amex/us/merchant/new-merchant-regulations/Reference-Guide_EN_US.pdf
- Guide to Managing Disputes, What to Expect when a Card Member Files a Dispute: https://www.americanexpress.com/content/dam/amex/us/merchant/pdf/manage-disputes/Amex_Policy_Updates_Factsheet.pdf

Merchants who accept Amex cards are given clear notice that "[f]or most dispute types, Card Members have up to 120 days from the transaction to dispute the charge" except when goods/services are not received "the timeframe can extend":

---

[1] "Subject to subsection (b), a creditor or lessor shall disclose to the person who is obligated on a consumer lease or a consumer credit transaction the information required under this subchapter." 15 U.S.C. § 1631(a).

https://www.americanexpress.com/content/dam/amex/us/merchant/pdf/American_Express_Disputes_Policy_Prop_.pdf

The Platinum Card® from American Express Cardmember Agreement does not mention the FCBA procedure for the correction of billing errors. It can be seen here: https://www.americanexpress.com/content/dam/amex/en-us/company/legal/cardmember-agreements/public-site-adhoc-2024-07-01/cps-charge/platinum-card-07-01-2024.pdf

When you say "[a]s per your CM Agreement and/or merchant policies, we are unable to investigate this charge", it is disheartening because there is not and cannot be anything in the CM Agreement and/or merchant policies that contradicts federal law. Under 15 U.S.C. § 1666(b)(3), "billing error" consists of "[a] reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction." Since the goods/service was not delivered to me by the merchant in accordance with our agreement and due to "noncompliance with requirements by creditor", federal law says Amex has forfeited the right to collect the transaction from me.[2]

It is also disheartening when you say "[p]lease contact the merchant directly" because I have already done so on countless occasions, but the merchant has refused to resolve the dispute. For this reason, I finally contacted Amex to open a dispute. The Code of Federal Regulations (CFR) explain that if Amex does not retrieve the funds from the merchant, then Amex becomes liable,[3] and 12 CFR § 1026.12(c)(1) says that I may "withhold payment up to the amount of credit outstanding for the property or services that gave rise to the dispute and any finance or other charges imposed on that amount."  The full details about this can be found in 12 CFR § 1026.12 ("Special credit card provisions" or "Regulation Z"), which the Consumer Financial Protection Bureau has published here: https://www.consumerfinance.gov/rules-policy/regulations/1026/12/

Federal law also states that "[w]hoever willfully and knowingly gives false or inaccurate information or fails to provide information which he is required to disclose under the provisions of this subchapter or any regulation issued thereunder, shall be fined

---

[2] "Any creditor who fails to comply with the requirements of this section or section 1666a of this title forfeits any right to collect from the obligor the amount indicated by the obligor under paragraph (2) of subsection (a) of this section". 15 U.S.C. § 1666(e).

[3] "The § 1026.12(c) credit card "holder in due course" provision deals with the consumer's right to assert against the card issuer a claim or defense concerning property or services purchased with a credit card, if the merchant has been unwilling to resolve the dispute. Even though certain merchandise disputes, such as non-delivery of goods, may also constitute "billing errors" under § 1026.13, that section operates independently of § 1026.12(c). The cardholder whose asserted billing error involves undelivered goods may institute the error resolution procedures of § 1026.13; but whether or not the cardholder has done so, the cardholder may assert claims or defenses under § 1026.12(c)." 12 CFR § 1026.12.

not more than $5,000 or imprisoned not more than one year, or both." (*See* 15 U.S.C. § 1611(1)).

     I trust that Amex representatives have not given me false or inaccurate information concerning the timeframes and process for correcting this billing error and not being held responsible to pay for this good/service that was not received. I am requesting this dispute be reopened to give me fair opportunity to exercise my right to not be held responsible for this transaction under the FCBA and TILA, and to ensure the merchant is made to comply with applicable federal law concerning this transaction. Thank you in advance for your time and consideration.


Sincerely,


*/s/ Tamah J. Clark*
Tamah J. Clark

Ph:
E-m

Re: Request for Detailed Letter
Ref. No. D-65609690

**Tuesday, July 23, 2024**

I am in receipt of your email sent July 23, 2024, at 12:14 AM concerning the billing error in connection with this dispute. Your email states that I need to give you a detailed letter about the billing error by August 7, 2024, or you will close the dispute and rebill the $5,597.73 to my account.

As I began to write the detailed letter you requested, it was brought to my attention that Amex has forfeited the right to rebill the $5,597.73 to my account due to failure to comply with applicable federal law as outlined in my previous letter to you (i.e. Request to Reopen Dispute) dated July 22, 2024.

The law says: "Any creditor who fails to comply with the requirements of this section or section 1666a of this title forfeits any right to collect from the obligor the amount indicated by the obligor under paragraph (2) of subsection (a) of this section". 15 U.S.C. § 1666(e). This means the $5,597.73, which was indicated by me as a billing error under 15 U.S.C. § 1666(a)(2), cannot be rebilled although your email says otherwise.

Federal law also states that "[w]hoever willfully and knowingly gives false or inaccurate information ... shall be fined not more than $5,000 or imprisoned not more than one year, or both." (*See* 15 U.S.C. § 1611(1)).

I trust that Amex has not willfully given me false information about being rebilled for $5,597.73 being that Amex has already forfeited that right. Accordingly, I am requesting this dispute be closed and the disputed amount of $5,597.73 be permanently removed from my account to ensure everyone remains in compliance with federal law. Thank you for your time and consideration.

Sincerely,

*/s/ Tamah J. Clark*
Tamah J. Clark

Ph: (
E-ma

## Attachment #5: Bank Director Oath

### General Instructions—Oath of Bank Director

National banking law at 12 USC 73 requires each elected or appointed director to take an oath that he or she will "diligently and honestly administer the affairs of such association, and will not knowingly violate or willingly permit to be violated any of the provisions" of the National Bank Act and that the director is the owner in his or her own right of the capital stock required by 12 USC 72.

The oath must be taken before a Notary Public, properly authorized and commissioned by the state in which the Notary resides, or before any other officer having an official seal and authorized by the state to administer oaths, except that the oath shall not be taken before any such Notary Public or other officer who is an officer of the director's bank. The Notary Public's resident state should be the same as the state in which the oath is administered.

Foreign or United States citizens who are abroad may satisfy the notarization requirement by using a foreign notary or the services of a local United States embassy or consulate. The latter option may be quicker and more effective.

### Converting Institutions

1. At the first meeting of the board, the directors take the joint oath of bank directors before a Notary Public. Regardless of whether the director is present, the director's name and address should be included on the joint oath.

2. Each director, who did not take the joint oath, must execute an individual oath before a notary.

3. When all directors have taken the oath, the secretary of the board forwards the executed oath(s) to the Licensing staff in the appropriate district office. The bank should retain a copy.

4. After the initial shareholders' meeting, any new directors will take the oath of directors following the procedures for existing national banks.

Questions related to the preparation of the oath should be directed to the Licensing staff in the appropriate district office.

# Oath of the Bank Director

Bank Name _____    Date _____

State of        _____

County of    _____

I, the undersigned, a director of the above-named bank do solemnly swear (affirm) that:

As a director, I have a legal responsibility and a fiduciary duty to shareholders to administer the depository institution's affairs faithfully and to oversee its management. In carrying out my duties and responsibilities, I shall exercise reasonable care and place the interests of the depository institution before my own interests.  I shall fulfill my duties of loyalty and care to the above-named depository institution.

I shall, commensurate with my duties, diligently and honestly administer the affairs of the depository institution, and I shall not knowingly violate, or willingly permit to be violated, any applicable statute or regulation.  I shall ensure that I learn of changes in statutes, regulations, and policies of the Office of Comptroller of the Currency, the Federal Deposit Insurance Corporation, or any state to whose jurisdiction my association is subject, which affect my duties, responsibilities, or obligations as a director and affiliated person of the association.

I am the owner, in good faith and in my own right, of the number of shares of stock that the law requires.  I have either subscribed for this stock or it is issued and outstanding, and it is not hypothecated, or in any way pledged, as security for any loan or debt.

I shall attend meetings of the board of directors and participate fully on all committees of the board to which I am appointed.

Signature _____

Typed Name _____

Mailing Address_____

City _____ State _____ ZIP Code _____

### Notary's Affirmation

Sworn to before me and subscribed in my presence, this ____ day of _____, _____.

Notary Public _____

My Commission Expires _____

# Joint Oath of Bank Directors

Bank Name _____ _____          Date: _____

State of          _____

County of      _____

We, the undersigned directors of the above-named bank, do, personally, and not one for the other, solemnly swear (affirm) that:

We, as directors, have a legal responsibility and a fiduciary duty to shareholders to administer the depository institution's affairs faithfully and to oversee its management. In carrying out our duties and responsibilities, we shall exercise reasonable care and place the interests of the depository institution before our own interests. We shall fulfill our duties of loyalty and care to the above-named depository institution.

We shall, commensurate with our duties, diligently and honestly administer the affairs of the depository institution; and we will not knowingly violate, or willingly permit to be violated, any applicable statute or regulation. We shall ensure that we learn of changes in statutes, regulations, and policies of the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, or any state to whose jurisdiction our association is subject, which affect our duties, responsibilities, or obligations as directors and affiliated persons of the association.

We are each the owner, in good faith, and in our own right, of the number of shares of stock that the law requires. We have either subscribed for this stock or it is issued and outstanding, and it is not hypothecated, or in any way pledged, as security for any loan or debt.

We shall attend meetings of the board of directors and participate fully on all committees of the board to which we are appointed.

1. _____
   Signature                          Post Office or Mailing Address

   _____
   Name (typed or printed)     City        State      ZIP Code

2. _____
   Signature                          Post Office or Mailing Address

   _____
   Name (typed or printed)     City        State      ZIP Code

3. _____
   Signature                          Post Office or Mailing Address

   _____
   Name (typed or printed)     City        State      ZIP Code

4. _____
      Signature                Post Office or Mailing Address

_____
      Name (typed or printed)    City      State    ZIP Code

5. _____
      Signature                Post Office or Mailing Address

_____
      Name (typed or printed)    City      State    ZIP Code

6. _____
      Signature                Post Office or Mailing Address

_____
      Name (typed or printed)    City      State    ZIP Code

7. _____
      Signature                Post Office or Mailing Address

_____
      Name (typed or printed)    City      State    ZIP Code

8. _____
      Signature                Post Office or Mailing Address

_____
      Name (typed or printed)    City      State    ZIP Code

9. _____
      Signature                Post Office or Mailing Address

_____
      Name (typed or printed)    City      State    ZIP Code

**Notary's Affirmation**

Sworn to before me and subscribed in my presence, this _____ day of _____, _____.

Notary Public _____

My Commission Expires: _____

**CFPB Consumer Laws and Regulations**                              **UDAAP**

# Unfair, Deceptive, or Abusive Acts or Practices

Unfair, deceptive, or abusive acts and practices (UDAAPs) can cause significant financial injury to consumers, erode consumer confidence, and undermine the financial marketplace. Under the Dodd-Frank Act, it is unlawful for any provider of consumer financial products or services or a service provider to engage in any unfair, deceptive or abusive act or practice.[1] The Act also provides CFPB with rule-making authority and, with respect to entities within its jurisdiction, enforcement authority to prevent unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.[2]  In addition, CFPB has supervisory authority for detecting and assessing risks to consumers and to markets for consumer financial products and services.[3]

As examiners review products or services, such as deposit products or lending activities, they generally should identify the risks of harm to consumers that are particular to those activities. Examiners also should review products that combine features and terms in a manner that can increase the difficulty of consumer understanding of the overall costs or risks of the product and the potential harm to the consumer associated with the product.

These examination procedures provide general guidance on:

- The principles of unfairness, deception, and abuse in the context of offering and providing consumer financial products and services;
- Assessing the risk that an institution's practices may be unfair, deceptive, or abusive;
- Identifying unfair, deceptive or abusive acts or practices (including by providing examples of potentially unfair or deceptive acts and practices); and
- Understanding the interplay between unfair, deceptive, or abusive acts or practices and other consumer protection statutes.

## Unfair Acts or Practices

The standard for unfairness in the Dodd-Frank Act is that an act or practice is unfair when:

(1) It causes or is likely to cause substantial injury to consumers;

(2) The injury is not reasonably avoidable by consumers; and

---

[1] Dodd-Frank Act, Title X, Subtitle C, Sec. 1036; PL 111-203 (July 21, 2010).

[2] Sec. 1031 of the Dodd-Frank Act. The principles of "unfair" and "deceptive" practices in the Act are similar to those under Sec. 5 of the Federal Trade Commission Act (FTC Act). The Federal Trade Commission (FTC) and federal banking regulators have applied these standards through case law, official policy statements, guidance, examination procedures, and enforcement actions that may inform CFPB.

[3] Dodd-Frank Act, Secs. 1024; 1025(b)(1); 1026(b) of the Act.

# CFPB Consumer
# Laws and Regulations                                        UDAAP

(3) The injury is not outweighed by countervailing benefits to consumers or to competition.[4]

- ***The act or practice must cause or be likely to cause substantial injury to consumers.***
  Substantial injury usually involves monetary harm. Monetary harm includes, for example, costs or fees paid by consumers as a result of an unfair practice.[5] An act or practice that causes a small amount of harm to a large number of people may be deemed to cause substantial injury.

  Actual injury is not required in every case. A significant risk of concrete harm is also sufficient. However, trivial or merely speculative harms are typically insufficient for a finding of substantial injury. Emotional impact and other more subjective types of harm also will not ordinarily amount to substantial injury. Nevertheless, in certain circumstances, such as unreasonable debt collection harassment, emotional impacts may amount to or contribute to substantial injury.

- ***Consumers must not be reasonably able to avoid the injury.***
  An act or practice is not considered unfair if consumers may reasonably avoid injury. Consumers cannot reasonably avoid injury if the act or practice interferes with their ability to effectively make decisions or to take action to avoid injury. Normally the marketplace is self-correcting; it is governed by consumer choice and the ability of individual consumers to make their own private decisions without regulatory intervention. If material information about a product, such as pricing, is modified after, or withheld until after, the consumer has committed to purchasing the product; however, the consumer cannot reasonably avoid the injury. Moreover, consumers cannot avoid injury if they are coerced into purchasing unwanted products or services or if a transaction occurs without their knowledge or consent.

  A key question is not whether a consumer could have made a better choice. Rather, the question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory. In addition, if almost all market participants engage in a practice, a consumer's incentive to search elsewhere for better terms is reduced, and the practice may not be reasonably avoidable.[6]

  The actions that a consumer is expected to take to avoid injury must be reasonable. While a consumer might avoid harm by hiring independent experts to test products in advance or by bringing legal claims for damages in every case of harm, these actions generally

---

[4] The standard for unfairness in the Dodd-Frank Act has the same three-part test as the FTC Act. This standard was first stated in the FTC Policy Statement on Unfairness (Dec. 17, 1980), *available at*:  http://www.ftc.gov/bcp/policystmt/ad-unfair.htm. Congress later amended the FTC Act to include this specific standard in the Act itself. 15 U.S.C. § 45(n).

[5] FTC Policy Statement on Unfairness, at p. 3.

[6] *See* Credit Practices Rule, 49 Fed. Reg. 7740, 7746 (1984).

# CFPB Consumer
# Laws and Regulations                                    UDAAP

would be too expensive to be practical for individual consumers and, therefore, are not reasonable.

- ***The injury must not be outweighed by countervailing benefits to consumers or competition.***

  To be unfair, the act or practice must be injurious in its net effects — that is, the injury must not be outweighed by any offsetting consumer or competitive benefits that also are produced by the act or practice. Offsetting consumer or competitive benefits of an act or practice may include lower prices to the consumer or a wider availability of products and services resulting from competition.

  Costs that would be incurred for measures to prevent the injury also are taken into account in determining whether an act or practice is unfair. These costs may include the costs to the institution in taking preventive measures and the costs to society as a whole of any increased burden and similar matters.

Public policy, as established by statute, regulation, judicial decision, or agency determination, may be considered with all other evidence to determine whether an act or practice is unfair. However, public policy considerations by themselves may not serve as the primary basis for determining that an act or practice is unfair.

## Examples

The examples described below stem from federal enforcement actions. They provide insight into practices that have been alleged to be unfair by other regulators and may inform CFPB's determinations. However, the particular facts in a case are crucial to a determination of unfairness. It is important to bear in mind that a change in facts could change the appropriate determination. Moreover, the brief summaries below do not present all of the material facts relevant to the determinations in each case. The examples show how the unfairness standard may be applied.

**<u>Refusing to release lien after consumer makes final payment on a mortgage.</u>**[7] The FTC brought an enforcement action against a mortgage company based on allegations, described below, that repeatedly failed to release liens after consumers fully paid the amount due on their mortgages.

- <u>Substantial injury.</u> Consumer's sustained economic injury when the mortgage servicer did not release the liens on their properties after the consumers had repaid the total amount due on the mortgages.

- <u>Not outweighed by benefits.</u> Countervailing benefits to competition or consumers did not result from the servicer's alleged failure to appropriately service the mortgage loan and release the lien promptly.

---

[7] *FTC v. Capital City Mortgage Corp*., Civil No. 98 CV-237 (D.D.C. Feb. 2005), *available at* http://www.ftc.gov/opa/2005/02/capitalcity.shtm.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

- <u>Not reasonably avoidable</u>. Consumers had no way to know in advance of obtaining the loan that the mortgage servicer would not release the lien after full payment. Moreover, consumers generally cannot avoid the harm caused by an improper practice of a mortgage servicer because the servicer is chosen by the owner of the loan, not the borrower. Thus, consumers cannot choose their loan servicer and cannot change loan servicers when they are dissatisfied with the quality of the loan servicing.

**<u>Dishonoring credit card convenience checks without notice</u>**.[8] The OTS and FDIC brought enforcement actions against a credit card issuer that sent convenience checks with stated credit limits and expiration dates to customers. For a significant percentage of consumers, the issuer reduced credit lines after the checks were presented, and then the issuer dishonored the consumers' checks.

- <u>Substantial injury.</u> Customers paid returned-check fees and may have experienced a negative impact on credit history.

- <u>Not outweighed by benefits.</u> The card issuer later reduced credit limits based on credit reviews. Based on the particular facts involved in the case, the harm to consumers from the dishonored convenience checks outweighed any benefit of using new credit reviews.

- <u>Not reasonably avoidable.</u> Consumers reasonably relied on their existing credit limits and expiration dates on the checks when deciding to use them for a payment. Consumers had received no notice that the checks they used were being dishonored until they learned from the payees. Thus, consumers could not reasonably have avoided the injury.

**<u>Processing payments for companies engaged in fraudulent activities.</u>**[9] The OCC brought an enforcement action in a case involving a bank that maintained deposit account relations with telemarketers and payment processors, based on the following allegations. The telemarketers regularly deposited large numbers of remotely created checks drawn against consumers' accounts. A large percentage of the checks were not authorized by consumers. The bank failed to establish appropriate policies and procedures to prevent, detect, or remedy such activities.

- <u>Substantial injury.</u> Consumers lost money from fraudulent checks created remotely and drawn against their accounts.

- <u>Not outweighed by benefits.</u> The cost to the bank of establishing a minimum level of due diligence, monitoring, and response procedures sufficient to remedy the problem would have been far less than the amount of injury to consumers that resulted from the bank's avoiding those costs.

---

[8]*In re American Express Bank, FSB* (Cease and Desist Order WN-09-016, and Order of Assessment of a Civil Money Penalty for $250,000, WN-09-017, June 29, 2009) OTS Docket No. 15648; *In re American Express Centurion Bank*, (Cease and Desist Order, June 30, 2009) Docket FDIC-09-251b, available at http://www.fdic.gov/news.

[9]*In re Wachovia Bank, National Association,* available at http://www.occ.treas.gov

# CFPB Consumer
# Laws and Regulations                                    UDAAP

- <u>Not reasonably avoidable.</u> Consumers could not avoid the harm because the harm resulted principally from transactions to which the consumers had not consented.

## Deceptive Acts or Practices

A representation, omission, actor practice is deceptive when

(1) The representation, omission, act, or practice misleads or is likely to mislead the consumer;

(2) The consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

(3) The misleading representation, omission, act, or practice is material.[10]

- ***There must be a representation, omission, act, or practice that misleads or is likely to mislead the consumer.***

  Deception is not limited to situations in which a consumer has already been misled. Instead, an act or practice may be deceptive if it is *likely to mislead* consumers.

  It is necessary to evaluate an individual statement, representation, or omission not in isolation, but rather in the context of the entire advertisement, transaction, or course of dealing, to determine whether the overall net impression is misleading or deceptive. A representation may be an express or implied claim or promise, and it may be written or oral. If material information is necessary to prevent a consumer from being misled, it may be deceptive to omit that information.

  Written disclosures may be insufficient to correct a misleading statement or representation, particularly where the consumer is directed away from qualifying limitations in the text or is counseled that reading the disclosures is unnecessary. Likewise, oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation. Similarly, a deceptive act or practice may not be cured by subsequent truthful disclosures.

  Acts or practices that may be deceptive include: making misleading cost or price claims; offering to provide a product or service that is not in fact available; using bait-and-switch techniques; omitting material limitations or conditions from an offer; or failing to provide the promised services.

  The FTC's "four Ps" test can assist in the evaluation of whether a representation, omission, act, or practice is likely to mislead:

  o Is the statement <u>prominent</u> enough for the consumer to notice?

---

[10]*See* FTC Policy Statement on Deception, available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm. Examiners should be informed by the FTC's standard for deception.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

o   Is the information <u>presented</u> in an easy-to-understand format that does not contradict other information in the package and at a time when the consumer's attention is not distracted elsewhere?

o   Is the <u>placement</u> of the information in a location where consumers can be expected to look or hear?

o   Finally, is the information in close <u>proximity</u> to the claim it qualifies?[11]

- ***The representation, omission, act, or practice must be considered from the perspective of the reasonable consumer.***

  In determining whether an act or practice is misleading, one also must consider whether the consumer's interpretation of or reaction to the representation, omission, act, or practice is reasonable under the circumstances. In other words, whether an act or practice is deceptive depends on how a reasonable member of the target audience would interpret the representation. When representations or marketing practices target a specific audience, such as older Americans, young people, or financially distressed consumers, the communication must be reviewed from the point of view of a reasonable member of that group.

  Moreover, a representation may be deceptive if the majority of consumers in the target class do not share the consumer's interpretation, so long as a significant minority of such consumers is misled. When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation.

  Exaggerated claims or "puffery," however, are not deceptive if the claims would not be taken seriously by a reasonable consumer.

- ***The representation, omission, or practice must be material.***

  A representation, omission, act, or practice is material if it is likely to affect a consumer's choice of, or conduct regarding, the product or service. Information that is important to consumers is material.

  Certain categories of information are presumed to be material. In general, information about the central characteristics of a product or service – such as costs, benefits, or restrictions on the use or availability – is presumed to be material. Express claims made with respect to a financial product or service are presumed material. Implied claims are presumed to be material when evidence shows that the institution intended to make the claim (even though intent to deceive is not necessary for deception to exist).

---

[11] FTC, *Dot Com Disclosures, Information about On-Line Advertising,* available at: http://business.ftc.gov/documents/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

# CFPB Consumer
# Laws and Regulations                    UDAAP

> Claims made with knowledge that they are false are presumed to be material. Omissions
> will be presumed to be material when the financial institution knew or should have known
> that the consumer needed the omitted information to evaluate the product or service.

If a representation or claim is not presumed to be material, it still would be considered material if
there is evidence that it is likely to be considered important by consumers.

## Examples

The examples described below stem from federal enforcement actions. They provide insight into
practices that have been alleged to be deceptive by other regulators and may inform CFPB's
determinations. However, as with unfairness, the particular facts in a case are crucial to a
determination of deception. It is important to bear in mind that a change in facts could change the
appropriate determination. Moreover, the brief summaries below do not present all of the
material facts relevant to the determinations in each case. The examples show how the deception
standard may be applied.

**Inadequate disclosure of material lease terms in television advertising.**[12] The FTC brought
actions against vehicle leasing companies alleging that their television advertisements
represented that consumers could lease vehicles for "$0 down" when advertising a monthly lease
payment. However, the FTC alleged that the "blur" of "unreadable fine print" that flashed on the
screen at the end of the advertisement disclosed costs of at least $1,000. The settlements
prohibited the vehicle leasing companies from misrepresenting the amount consumers must pay
when signing the lease.

In addition, the FTC required that if the companies make any representation about the amounts
due at lease signing, or that there is "no down payment," the companies must make an equally
prominent (readable and audible) disclosure of the total amount of all fees due when consumers
sign the lease.

- <u>Representation or omission likely to mislead.</u>  The television advertisements featured
  prominent statements of "no money down" or "$0 down" at lease signing. The advertisement
  also contained, at the bottom of the screen, a "blur" of small print in which disclosures of
  various costs required by Regulation M (the Consumer Leasing Act) were made. The FTC
  alleged that the disclosures were inadequate because they were not clear, prominent, or
  audible to consumers.

- <u>Reasonable consumer perspective.</u> A reasonable consumer would believe that he did not have
  to put any money down and that all he owed was the regular monthly payment.

- <u>Material representation.</u> The stated "no money down" or "$0 down" plus the low monthly
  lease payment were material representations to consumers. The fact that the additional,

---

[12] *In the matters of Mazda Motor of America, Inc.; Mitsubishi Motor Sales of America, Inc.; American Honda Motor Company,
Inc.; General Motors Corporation; American Isuzu Motors, Inc.,* available at <u>*http://www.ftc.gov/opa/1997/02/petapp09.shtm*</u>.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

material costs were disclosed at signing of the lease did not cure the deceptive failure to disclose in the television advertising, the FTC claimed.

**Misrepresentation about loan terms.**[13] In 2004, the FTC sued a mortgage broker advertising mortgage refinance loans at "3.5% fixed payment 30-year loan" or "3.5% fixed payment for 30 years," implying that the offer was for a 30-year loan with a 3.5% fixed interest rate. Instead, the FTC claimed that the broker offered adjustable rate mortgages (ARMs) with an option to pay various amounts, including a minimum monthly payment that represented only a portion of the required interest. As a result, unpaid interest was added to the principal of the loan, resulting in negative amortization.[14]

- Practice likely to mislead. The FTC claimed that the advertisements were misleading because they compared payments on a mortgage that fully amortized to payments on a non-amortizing loan with payments that increased after the first year. In addition, the FTC claimed that after application, the broker provided Truth in Lending Act (TILA) disclosures that misstated the annual percentage rate (APR) and that failed to state that the loan was a variable rate loan.

- Reasonable consumer perspective. It was reasonable for consumers to believe that they would obtain fixed-rate mortgages, based on the representations.

- Material representation. The representations were material because consumers relied on them when making the decision to refinance their fully amortizing 30-year fixed loans. As a result, the consumers ended up with adjustable rate mortgages that would negatively amortize if they made payments at the stated 3.5% payment rate.

---

[13] FTC v. Chase Financial Funding, Inc., No. SACV04-549 (C.D.Cal. 2004), Stipulated Preliminary Injunction, available at http://www.ftc.gov/os/caselist/0223287/0223287.shtm.

[14] In 2008, amendments to the Truth in Lending Act's Regulation Z were adopted to prohibit certain advertising practices, such as misleading advertising of fixed rates and payments, for credit secured by a dwelling. Similar practices could be identified as deceptive in other product lines. See 73 Fed. Reg. 44522 (July 30, 2008) (promulgating 12 CFR 226.24), which has since been recodified as 12 CFR 1026.24.

# CFPB Consumer
# Laws and Regulations                                    UDAAP

## Abusive Acts or Practices

The Dodd-Frank Act makes it unlawful for any covered person or service provider to engage in an "abusive act or practice."[15] An abusive act or practice:

- Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or

- Takes unreasonable advantage of:

  o A lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

  o The inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or

  o The reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

Although abusive acts also may be unfair or deceptive, examiners should be aware that the legal standards for abusive, unfair, and deceptive each are separate.

## The Role of Consumer Complaints in Identifying Unfair, Deceptive, or Abusive Acts or Practices

Consumer complaints play a key role in the detection of unfair, deceptive, or abusive practices. Consumer complaints have been an essential source of information for examinations, enforcement, and rule-making for regulators. As a general matter, consumer complaints can indicate weaknesses in elements of the institution's compliance management system, such as training, internal controls, or monitoring.

While the absence of complaints does not ensure that unfair, deceptive, or abusive practices are not occurring, complaints may be one indication of UDAAPs. For example, the presence of complaints alleging that consumers did not understand the terms of a product or service may be a red flag indicating that examiners should conduct a detailed review of the relevant practice. This is especially true when numerous consumers make similar complaints about the same product or service. Because the perspective of a reasonable consumer is one of the tests for evaluating whether a representation, omission, act, or practice is potentially deceptive, consumer complaints alleging misrepresentations or misunderstanding may provide a window into the perspective of the reasonable consumer.

When reviewing complaints against an institution, examiners should consider complaints lodged against subsidiaries, affiliates, and third parties regarding the products and services offered through the institution or using the institution's name. In particular, examiners should determine

---

[15] Dodd-Frank Act, Sec. 1036(a)(1)(B), 12 U.S.C. § 5536(a)(1)(B).

# CFPB Consumer
# Laws and Regulations                    UDAAP

whether an institution itself receives, monitors, and responds to complaints filed against subsidiaries, affiliates, and third parties. Consumers can file complaints at a number of entities: the institution itself, the Better Business Bureau, State Attorneys General, the FTC's Consumer Sentinel, the CFPB Consumer Response Center, other Federal and State agencies, or on-line consumer complaint boards such as www.ripoffreport.com or www.complaints.com.

## Analyzing Complaints

Analysis of consumer complaints may assist in the identification of potential unfair, deceptive, or abusive practices. Examiners should consider the context and reliability of complaints; every complaint does not indicate violation of law. When consumers repeatedly complain about an institution's product or service, however, examiners should flag the issue for possible further review. Moreover, even a single substantive complaint may raise serious concerns that would warrant further review. Complaints that allege, for example, misleading or false statements, or missing disclosure information, may indicate possible unfair, deceptive, or abusive acts or practices needing review.

Another area that could indicate potential unfair, deceptive, or abusive acts or practices is a high volume of charge-backs or refunds for a product or service. While this information is relevant to the consumer complaint analysis, it may not appear in the institution's complaint records.

## Relationship to Other Laws

An unfair, deceptive, or abusive act or practice may also violate other federal or state laws. For example, pursuant to the TILA, creditors must "clearly and conspicuously" disclose the costs and terms of credit. An act or practice that does not comply with these provisions of TILA may also be unfair, deceptive, or abusive.

Conversely, a transaction that is in technical compliance with other federal or state laws may nevertheless violate the prohibition against UDAAPs. For example, an advertisement may comply with TILA's requirements, but contain additional statements that are untrue or misleading, and compliance with TILA's disclosure requirements does not insulate the rest of the advertisement from the possibility of being deceptive.